IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MONACO COACH CORPORATION, et al.,[1] | ) | Case No. 09-10750-KJC |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING
BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (B) SCHEDULING
AN AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE
FORM AND MANNER OF NOTICE RELATED THERETO; (C) ESTABLISHING
PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS;
(D) ESTABLISHING PROCEDURES RELATING TO THE REJECTION OF CERTAIN
CONTRACTS; (E) APPROVING CERTAIN EXPENSE REIMBURSEMENT
PROVISIONS AND BREAKUP FEE; AND (F) GRANTING RELATED RELIEF**

The captioned debtors and debtors in possession (the "Debtors") hereby move this Court

for the entry of an order:  (a) approving bid procedures and certain overbid protections in

connection with the sale of substantially all of the Debtors' assets; (b) scheduling an auction and

hearing to consider the sale of and approve the form and manner of notices related thereto;

(c) establishing procedures for the assumption and assignment of certain contacts that will be

assumed and assigned as part of the sale; (d) establishing procedures relating to the rejection of

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, if applicable, are:  Monaco Coach Corporation (0244); Signature Motorcoach Resorts, Inc.
(8980); Naples Motorcoach Resort, Inc. (1411); Port of the Isles Motorcoach Resort, Inc. (8524); Outdoor
Resorts of Las Vegas, Inc. (8478); Outdoor Resorts Motorcoach Country Club, Inc. (1141); Signature
Resorts of Michigan, Inc. (4020); La Quinta Motorcoach Resorts, Inc. (9661); R-Vision Holdings L.L.C.
(2820); R-Vision, Inc. (3151); R-Vision Motorized, LLC (1985); Bison Manufacturing, LLC (0778) and
Roadmaster LLC (5174).  The address for each of the Debtors is 91320 Coburg Industrial Way, Coburg,
OR  97408, with the exceptions of R-Vision, Inc., R-Vision Motorized, LLC, Bison Manufacturing, LLC
and Roadmaster LLC, for which the address is 606 Nelson's Parkway, Wakarusa, IN  465733060; and La
Quinta Motorcoach Resorts, Inc., for which the address is 80-501 Ave 48, Indio, CA 92201.

certain contracts; (e) approving certain expense reimbursement provisions and breakup fee; and (f) granting related relief (this "Motion"). In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction and Venue

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

4.     On March 5, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under the Bankruptcy Code. The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.     No request has been made for the appointment of a trustee or an examiner in this case.

2

6.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the *Declaration of P. Martin Daley in Support of First Day Motions* (the "Daley Declaration"), previously filed in these cases and incorporated herein by reference.

7.      In order to maximize the value of their business and assets for the benefit of creditors, the Debtors have determined to market and sell certain assets related to their core RV manufacturing business to the highest and best bidder during the bankruptcy cases, for the benefit of the estates and their creditors.

## The Sale Process

8.      The Debtors retained Imperial Capital LLC prepetition as their financial advisor and investment banker in connection with the marketing and sale of their assets, and significant efforts have been undertaken by the Debtors and their agents, relating to the preparation of marketing materials, creation of an electronic data room and other marketing efforts.

9.      The Debtors by this Motion seek approval of the Bid Procedures (hereinafter defined), under which Workhorse International Holding Company (the "Stalking Horse Purchaser") is the stalking horse bidder for certain assets related to the Debtors' core RV manufacturing business (the "Assets"). The terms of the Stalking Horse Purchaser's bid are summarized below.

10.     The Debtors with the assistance of Imperial Capital LLC and their other professionals intend to market and seek higher and better bids for the Assets and, pursuant to the

3

Bid Procedures, to hold the Auction in May, 2009 on the date specified by the Court. The Debtors believe that such marketing of their assets over the period contemplated by the Bid Procedures in addition to the 4 months of marketing efforts that have taken place to date, will result in the highest and best price for those assets.

### The Agreement with the Purchaser

11.     On April 22, 2009, after extensive negotiations, the Debtors entered into an Asset Purchase Agreement (the "Original Agreement") with the Stalking Horse Purchaser. On April 23, 2009, the Original Agreement was amended and restated in its entirety by an Amended and Restated Agreement (the "Agreement"). A copy of the Agreement, without schedules and exhibits, is attached hereto as Exhibit A. Pursuant to the terms of the Agreement, the Stalking Horse Purchaser, subject to (a) a court approved auction and sale process approval of which is sought by this Motion and (b) the submission of higher and better offers, will purchase the Assets, including certain contracts and leases.

12.     The Debtors, subject to such court-approved auction and sale process and higher and better offers, intend to sell and assign (the "Sale") the Assets to the Stalking Horse Purchaser pursuant to the Agreement, contemporaneously with the filing of this Motion.

13.     The terms of the Stalking Horse Purchaser's offer to purchase the Assets are set forth in the Agreement and are summarized below. The description below only summarizes certain provisions of the Agreement, and the terms of the Agreement control in the event of any inconsistency.

4

(a.)  **Purchase Price**.  The aggregate purchase price for the Assets (the "Purchase Price") shall be (i) an amount equal to $52,000,000 (the "Estimated Cash Portion") minus (A) the sum of (x) sixty percent (60%) of the amount (if any) by which the RV Finished Goods Inventory (as defined in the Agreement) of Sellers as of the Closing Date as shown on the Closing Statement (as defined in below) (the "Closing RV Finished Goods Inventory") is less than the Baseline RV Finished Goods Inventory (as defined in the Agreement), (y) sixty-three percent (63%) of the amount (if any) by which the Chassis Inventory (as defined in the Agreement) of Sellers as of the Closing Date as shown on the Closing Statement (the "Closing Chassis Inventory") is less than the Baseline Chassis Inventory (as defined in the Agreement), and (z) twenty-nine percent (29%) of the sum of (I) the amount (if any) by which the RV Raw Material Inventory (the defined in the Agreement) of Sellers as of the Closing Date as shown on the Closing Statement (the "Closing RV Raw Material Inventory") is less than the Baseline RV Raw Material Inventory (as defined in the Agreement) and (II) the amount (if any) by which the RV WIP Inventory (as defined in the Agreement) of Sellers as of the Closing Date as shown on the Closing Statement (the "Closing RV WIP Inventory") is less than the Baseline RV WIP Inventory (as defined in the Agreement) (the sum of the amounts described in subclauses (I) and (II) being referred to as the "Combined Raw and WIP Shortfall"), minus (B) the net book value of any Missing Equipment as shown on the Closing Statement, minus (C) the amount of Cure Payments made by the Purchaser on behalf of Sellers pursuant to Section 2.6 of the Agreement; provided, however, that the aggregate amount of such Cure Payments shall not exceed $550,000, minus (D) the Section 2.2(a)(ii) Liabilities minus (E) the amounts Purchaser is entitled to deduct

5

from the Purchase Price under Section 6.10, Section 6.16 or any other Section of the Agreement (the amount in subsection (i) above, the "Cash Portion"), and (ii) the assumption of the Assumed Obligations.

Notwithstanding anything to the contrary above, the Estimated Cash Portion shall be reduced (i) in the case of the Closing RV Raw Material Inventory and the Closing RV WIP Inventory, only if and to the extent that the Combined Raw and WIP Shortfall exceeds $500,000 (on a gross basis before application of the 29% factor referred to above) and (ii) in the case of Missing Equipment, only if and to the extent that the net book value of the Missing Equipment exceeds $500,000. *See* Agreement §§ 3.1(a) and (b).

(b.) **Assets.** All properties, assets, rights, titles and interests of every kind and nature, of Sellers (including indirect and other forms of beneficial ownership) as of the Closing Date, which are used in or related to the activities carried on by Sellers and any of their Affiliates relating to the design, manufacture, marketing, distribution and sale of gasoline and diesel-powered motorhomes, towable recreational vehicles, and chassis, including the Bison Trailer Business, but excluding the Roadmaster Cargo Trailer Business and the Motorhome Resorts Business (the "Business"), whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, without limitation, all of the following assets but excluding Excluded Assets (as defined below), as described in further detail in the Agreement: all Intellectual Property used in or related to the Business; all trademarks, service marks, logos, slogans, trade names, and corporate names (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names incorporating "Roadmaster", "R-

6

Sport" or any derivations therefrom and all goodwill associated with any of the foregoing, together with all income, royalties, damages and payments due or payable to Sellers as of the Closing or thereafter; all trademarks, service marks, logos, slogans, trade names, and corporate names (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names incorporating "Signature Resorts Design" logo or any derivations therefrom and all goodwill associated with any of the foregoing, together with all income, royalties, damages and payments due or payable to Sellers as of the Closing or thereafter; all of Sellers' rights existing under the Assumed Executory Contracts set forth on Schedule 2.1(a)(iv) of the Agreement; all Acquired Owned Real Property set forth on Schedule 2.1(a)(v) of the Agreement; all supplier based tooling, wherever located; all signage and other materials incorporating the logos, trademarks, trade names, corporate names, service marks, or brand designations of Sellers, which are owned by any Seller but are leased or otherwise held by Monaco Dealers (as defined in the Agreement); all computer systems, including software, hardware, networks and interfaces owned or leased by Sellers which are used in, or held for use in, the Business ("Systems"); all leasehold improvements and all machinery, tooling (including all tooling and "old" molds for former models), equipment (including all transportation, vehicles, testing equipment and office equipment), fixtures, trade fixtures, computer equipment and hardware, telephone systems, network systems and furniture owned by Sellers and, in each case, used in or related to the Business, wherever located; all Inventory used in or related to the Business; all office supplies, production supplies and other supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind used in or related to the

7

Business; all RV show deposits related to the Business; all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) related to the Assets or the Business (other than those related to the Excluded Assets or the Excluded Liabilities); the right to receive and retain mail and other communications used in or related to the Business; all deposits and prepayments held by Third Parties pursuant to any Assumed Executory Contract; all Books and Records used in or related to the Business; all advertising, marketing and promotional materials and all other printed or written materials used in or related to the Business; all transferable Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies, used in or related to the Business; all goodwill as a going concern and all other intangible properties used in or related to the Business; all telephone numbers and IP addresses used in or related to the Business; all promotional allowances, vendor rebates and similar items related to the Business; the rights to make claims and to receive proceeds under insurance policies to the extent related to an Asset or the Business or to the extent a liability is asserted against Purchaser or any of its Affiliates in connection with the Assets or the Business; Monaco Coach Corporation's membership in the Recreation Vehicle Industry Association ("RVIA") and all deposits previously paid to RVIA associated with such membership; and all security deposits relating to Assumed Executory Contracts. *See* Agreement § 2.1.

8

(c.) **Excluded Assets**. Notwithstanding anything to the contrary in the Agreement, the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to Stalking Horse Purchaser (all of the following are referred to collectively as the "Excluded Assets"): any and all rights under the Agreement and avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law, including, without limitation, all rights and avoidance claims of Sellers arising under chapter 5 of the Bankruptcy Code; all Owned Real Property and any other interests in real property in each case, other than the Acquired Owned Real Property (each as defined in the Agreement); all leases of Sellers other than the Assumed Equipment Leases (the "Excluded Leases") and all Contracts other than the Assumed Executory Contracts (the "Excluded Contracts"); any asset or Contract set forth on Schedule 2.3(c) to the Agreement; provided that the Stalking Horse Purchaser may amend the Disclosure Schedules setting forth the Assets and the Excluded Assets attached to the Agreement at any time on or before five (5) days prior to the Closing Date in order to exclude from the definition of Asset, and include in the definition of Excluded Asset, any other asset, lease or Contract not otherwise excluded, as the case may be; provided, however, that such exclusion shall not serve to reduce or otherwise affect the amount of the Purchase Price; all cash (including, without limitation, checking account balances, certificates of deposit and other time deposits and petty cash) ("Cash") and marketable and other securities; the prepayments and deposits other than those included in Section 2.1(a) of the Agreement and all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment other than those included in Section 2.1(a); all of Sellers' accounts and notes

9

receivable (whether current or noncurrent) and all causes of action specifically pertaining to the collection of the foregoing; all assets, properties, rights, titles and interests, all Inventory and all Intellectual Property, used exclusively in connection with the operation of the Roadmaster Cargo Trailer Business; any aircraft hangers or related assets (including any aircraft) owned, leased or guaranteed by any Seller, wherever located; all assets, rights, titles and interests, all Inventory and all Intellectual Property, used exclusively in connection with the operation of the Motorhome Resorts Business, including land held as inventory, wherever located; all machinery, tooling, equipment, trade fixtures, computer equipment and hardware, telephone systems, network systems and furniture owned by Sellers and not used in or related to the Business or set forth on Schedule 2.3(k) to the Agreement; all of Sellers' Tax refunds, rebates, credits and similar items relating to any period, or any portion of any period, on or prior to the Closing Date; U.S. intent-to-use trademark application for NAUTICA (serial number 77/188276 filed on 5/23/2007) and all goodwill associated therewith; all real and tangible personal property presently located at the 4505 Monaco Way, Wildwood, Florida 34785 Owned Real Property (the "Wildwood Assets"); provided, however, that the Wildwood Assets shall not include any Intellectual Property of Sellers used in or related to the Business; income Tax Returns of Sellers and related materials; the equity securities or other ownership interest of any Seller; and he equity securities or other ownership interest of any of Sellers' Affiliates. *See* Agreement § 2.3.

> (d.) **Assumed Obligations**. Subject to the terms and conditions set forth in the Agreement, the Stalking Horse Purchaser shall only assume from Sellers and thereafter be responsible for the payment, performance or discharge of the following liabilities

and obligations of Sellers (all such liabilities and obligations herein called the "Assumed Obligations"): obligations under the Assumed Executory Contracts first arising after the Closing (but excluding liabilities for breaches of such contracts or commitments occurring prior to the Closing Date); and up to $2,000,000 in other liabilities (such as trade or accounts payable with key suppliers and/or certain rebates to dealers), if any, expressly set forth on Schedule 2.2(a)(ii) attached to the Agreement, which shall reduce the Purchase Price on a dollar-for-dollar basis (the "Section 2.2(a)(ii) Liabilities"). *See* Agreement § 2.2.

(e.) **Excluded Liabilities**. Pursuant to the terms and provisions of the Agreement, the Stalking Horse Purchaser will not assume, or in any way be liable or responsible for, any Liability or obligation of any Seller (including Liabilities relating to (x) Excluded Assets and (y) the pre-petition or post-petition (but pre-Closing) operation of the Business or the Assets (and the use thereof)), whether relating to or arising out of the Business, the Excluded Assets or the Assets or otherwise, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, other than the Assumed Obligations. *See* Agreement § 2.4.

(f.) **Contracts to be Assumed and Assigned**. The Sellers shall assume and assign to the Stalking Horse Purchaser pursuant to section 365(a) of the Bankruptcy Code all Contracts identified in Schedule 2.1(a)(iv) attached to the Agreement under the heading "Assumed Contracts," other than those excluded by the Stalking Horse Purchaser from the Assets pursuant to Section 2.3(d) of the Agreement and all equipment leases identified in Schedule 2.1(a)(iv) attached to the Agreement under the heading "Assumed Equipment Leases,"

other than those excluded by Purchaser from the Assets pursuant to Section 2.3(d) of the Agreement. The Stalking Horse Purchaser may add to the list of Assumed Executory Contracts (so long as the Debtors file and serve the Cure Notice on the Counterparty (defined below) within fifteen (15) calendar days before the Sale Hearing).

(g.) **Contracts to be Rejected**. It is a condition of the Stalking Horse Purchaser's obligations under the Agreement that (i) the Debtors file a motion(s) to reject (the "Rejection Motion"): (x) all agreements between a Seller and any Person authorized by any Seller to be a dealer of, or granted the right to purchase for resale Sellers' gasoline and diesel-powered motorhomes, and towable recreational vehicles and (y) all other Contracts listed on Schedule 8.8 attached to the Agreement (collectively, the "Rejected Contracts"), and (ii) the Court has issued an Order approving such Rejection Motion. *See* Agreement §§ 8.8 and 8.9.

(h.) **Closing**. The closing of the transactions under the Agreement (the "Closing") shall take place no later than the first business day after the date on which the conditions set forth in Article VIII and Article IX have been satisfied or waived in writing; or on such other date or place as the Stalking Horse Purchaser and Monaco Coach Corporation may determine (the "Closing Date"). *See* Agreement § 10.1.

(i.) **Representations and Warranties**. The Agreement contains standard representations and warranties for a transaction of this nature. *See* Agreement, Arts. IV & V.

(j.) **Guarantee**. The Agreement includes the guarantee of Navistar, Inc. of all of the obligations of the Stalking Horse Purchaser under the Agreement.

12

14.     The Debtors believe that the sale of the Assets as a going concern to the Stalking Horse Purchaser or a higher and better bidder determined in accordance with the Bid Procedures is far preferable to a piecemeal liquidation of the Debtors' assets. The Debtors further believe that their obtaining the Stalking Horse Purchaser as a stalking horse bidder, marketing their Assets with the assistance of Imperial Capital LLC and their other professionals for approximately 4 months, and holding the Auction of such Assets on the date specified by the Court, in May, 2009, will result in the highest and best price for the Assets.

15.     The Debtors have examined the alternatives to a going concern sale of the Assets and have determined that, in light of their financial situation and liquidity needs, a viable alternative to such a sale is not available. In addition, the Debtors' efforts to sell a major portion of their assets, as provided by this Motion, is a milestone requirement of the interim order for use of cash collateral entered March 27, 2009 for the Debtors' use of cash collateral in the Chapter 11 cases, which condition includes that the sale must be consummated by June 1, 2009.

16.     For the reasons stated above, and in light of the obvious benefits to the estates, the Debtors' Boards of Directors have determined, in the exercise of their business judgment, to consummate the proposal submitted under the Agreement with the Stalking Horse Purchaser or, if applicable, another bidder in the event that the Debtors receives a higher and better bid to the one proposed by the Stalking Horse Purchaser.

## Relief Requested

17.     Pursuant to this Motion, the Debtors request that the Court, among other things:

(a.)     approve the Stalking Horse Purchaser's status as the stalking horse purchaser and approve the requested expense reimbursement of up to $1,250,000 (the "Expense Reimbursement") and breakup fee of $1,750,000 (the "Breakup Fee") pursuant to the terms of the Agreement;

(b.)     approve the proposed bid procedures (the "Bid Procedures"), including the overbid provisions, attached hereto as Exhibit B;

(c.)     approve the procedures set forth herein for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Cure Procedures");

(d.)     approve the procedures set forth herein for the rejection of certain contracts;

(e.)     establish a date for holding the auction (the "Auction") and approve certain procedures in connection therewith;

(f.)     schedule the hearing to approve any sale transaction(s) to the Stalking Horse Purchaser or to such other party that makes the higher or best offer for the Assets (the "Successful Bidder") and establishing deadlines for objections and responses to the relief requested in the Sale Motion; and

(g.)     approve the form and manner of notice to be served upon certain parties, including: (i) the form of notice, substantially in the form attached hereto as Exhibit C, to be served on the Sale and Bid Procedures Notice Parties (defined below); (ii) the form of notice, substantially in the form attached hereto as Exhibit D, to be served on all known creditors and known customers of the Debtors (the "Creditor Notice"); (iii) the form of notice to parties holding Assumed Executory Contracts in conjunction with the proposed Sale, in substantially the form attached hereto as Exhibit E (the "Cure Notice"); and (iv) the form of notice to counterparties to the Rejected Contracts, in substantially the form attached hereto as Exhibit F (the "Rejection Notice").

Bid Procedures

18.     The Bid Procedures are attached hereto as Exhibit B.  The Bid Procedures are summarized as follows:

(a.)     Assets to be Sold:  The Debtors are offering for sale in one or more transactions the Assets, which are certain assets related to the Debtors' motorhome, towable recreational vehicle, and chassis manufacturing business.  The Assets for sale do not include the Excluded Assets.

(b.)     Potential Bidders; Confidentiality Agreement:  Any person interested in participating in the bidding process for all or a portion of the Assets (each a "Potential Bidder") must deliver (unless previously delivered) to the Debtors and their counsel an executed confidentiality agreement in form and substance acceptable to the Debtors and their

15

counsel, which form is attached to the Bid Procedures, and satisfy the other requirements set forth in the Bid Procedures.

(c.) <u>Qualified Bidders</u>. A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtors do not overlap and who also are referred to in the Bid Procedures as a single Qualified Bidder) that delivers the confidentiality agreement and the documents described the Bid Procedures with respect to its proof of financial ability to perform, and that the Debtors in their discretion and with assistance from their advisors determine is reasonably likely to submit a *bona fide* offer that would result in greater value being received for the benefit of the Debtors' creditors than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below). The Stalking Horse Purchaser (together with any assigns) is a Qualified Bidder and is deemed to satisfy all Bid Requirements (hereinafter defined).

(d.) <u>Bidding Process</u>. The Debtors and their advisors, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions of the Bid Procedures; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets (collectively, the "Bidding Process"). The Debtors, with the consent of the Stalking Horse Purchaser and in consultation with the Committee, may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order. All such rules will provide that all Bids shall be made and received in one

16

room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all

bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals

submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material

terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the

entire Auction.

          (e.)     <u>Bid Deadline</u>.  The Debtors propose that the deadline for

submitting bids by a Qualified Bidder shall be May 14, 2009, at 4:00 p.m. (Eastern Time) (the

"Bid Deadline").  Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer,

solicitation or proposal (a "<u>Bid</u>") shall deliver written copies of its Bid to: (i) the Debtors,

Monaco Coach Corporation, 91320 Coburg Industrial Way, Coburg, Oregon  97408, Attn:  Kay

L. Toolson, Chairman and Chief Executive Officer, with a copy to counsel for the Debtors,

Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles,

California 90067-4100, Attn: Robert B. Orgel and Malhar S. Pagay, and Pachulski Stang Ziehl &

Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware  19801, Attn: Laura Davis

Jones and Timothy P. Cairns and counsel for the Debtors, Wilson Sonsini Goodrich & Rosati,

Professional Corporation, One Market Street, Spear Tower, Suite 3300, San Francisco,

California 94105-1126, Attn:  Robert Ishii and Jeremiah Gordon; (ii) investment banker to the

Debtors, Imperial Capital LLC, 2000 Avenue of the Stars, 9th Floor South, Los Angeles, CA

90067, Attn: Marc Bilbao and Scott Farnsworth; (iii) counsel to the Official Committee of

Unsecured Creditors, Greenberg Traurig, LLP, The Nemours Building, 1007 North Orange

Street, Suite 1200, Wilmington, Delaware  19801, Attn: Donald J. Detweiler, Esquire; Greenberg

Traurig LLP, 2700 Two Commerce Square, 2001 Market Street, Philadelphia, Pennsylvania

19103, Attn: Diane E. Vuocolo; and Greenberg Traurig, LLP, 77 West Wacker Drive, Suite

3100, Chicago, Illinois 60601; Attn: Sean Bezark; (iv) counsel to Ableco, Schulte Roth & Zabel

LLP, 919 Third Avenue, New York, New York 10022, Attn: Adam Harris and Abbey Walsh;

(v) counsel to Bank of America, N.A. ("B of A"), Buchalter Nemer Fields & Younger, 601 S.

Figueroa Street, 24th Floor, Los Angeles, CA 90017, Attn: William Brody and Paul Arrow; and

(vi) counsel to Navistar, Inc., Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois

60654, Attn: Keith S. Crow (collectively, the "Notice Parties"), by the Bid Deadline, provided,

however, that any confidential financial information may be delivered to the Debtors and their

counsel only. A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

      (f.)    Bid Requirements. The Debtors propose that, to be eligible to

participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be

determined by the Debtors to satisfy each of the following conditions:

     (1)    Good Faith Deposit. Each Bid, other than a Bid submitted by the Stalking Horse Purchaser or by a secured lender submitting a credit bid, must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of the Debtors in an amount equal to $2,500,000. If a Bidder is bidding on less than substantially all of the Assets, the amount of such Bidder's Good Faith Deposit shall be a minimum the greater of 5% of the Bidder's offer, or $150,000, provided that deposits in any event do not exceed $2.5 million.

     (2)    Minimum Overbid. The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtors, on consultation with Ableco, B of A, and the Committee, provided, however, that notwithstanding the foregoing, to qualify for the Auction, such Bid must be for more than an amount equal to the aggregate of the sum of (a) the Cash Portion (as defined in

18

the Agreement) in cash and the assumption of the Assumed Obligations; (b) $1,500,000 in cash; (c) the dollar value of the Breakup Fee in cash, and (d) the dollar value of the Expense Reimbursement in cash. Notwithstanding the foregoing, a secured lender may make a Qualified Bid for the collateral securing its claims to the fullest extent permitted by section 363(k) of Bankruptcy Code, provided that such secured lender shall post a cash deposit equal to 5% of the excess of the amount of its Bid over the value of its credit bid and must provide for payment in cash at closing and/or the assumption of only (1) senior liens; (2) unpaid administrative priority expense claims of the Sellers, including the contingent or success fee payable upon the subject sale, (3) cash sufficient to pay the Breakup Fee and the Expense Reimbursement and (4) amounts bid in excess of their secured claims or allocable to non-collateral.

(3)     Irrevocable. All bids must be, and the Agreement is, irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court (the "Termination Date").

(4)     The Same or Better Terms. The Bid must be on terms that, in the Debtors' business judgment, are substantially the same or better than the terms of the Agreement. A Bid must include an executed agreement pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents"). A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to the Purchase Price). The Contemplated Transaction Documents must include a commitment to close by the Termination Date and contain a representation that the Qualified Bidder shall make all necessary HSR Act filings, if any, and pay all costs and expenses of such filings (including the Debtors' costs and expenses). A Bid should propose a contemplated transaction involving all or substantially of the Assets, provided, however, that the Debtors in their discretion may consider proposals for less than substantially all the Assets, provided further that the Debtors will evaluate all Bids, in their sole discretion, to determine whether such Bid or combination of Bids maximizes the value of the Debtors' estates as a whole.

For the avoidance of any doubt, the Debtors note that Bids do not have to be for

substantially all of the Assets, provided that the other Bid Procedures requirements are satisfied.

      (5)    <u>Contingencies</u>. A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence other than as may be included in the Agreement, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement.

      (6)    <u>Financing Sources</u>. A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources.

      (7)    <u>No Fees Payable to Qualified Bidder</u>. Except with respect to the Expense Reimbursement and the Breakup Fee provided to the Stalking Horse Purchaser pursuant to the Agreement, a Bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

      (8)    <u>Immediate Payment of the Breakup Fee and Expense Reimbursement</u>. A Bid must provide for the immediate payment of the Breakup Fee and Expense Reimbursement to the Stalking Horse Purchaser from the first proceeds of the cash portion of the purchase price of such Bid.

    (g.)    <u>Qualified Bids.</u> The Debtors propose that a Bid received from a

Qualified Bidder, other than from the Stalking Horse Purchaser, before the Bid Deadline that

meets the above requirements and that satisfies the Bid Deadline requirement above shall

constitute a "Qualified Bid," if the Debtors believe, in their reasonable discretion, that such Bid

would be consummated if selected as the Successful Bid. The Debtors shall have the right to

20

reject any and all bids that they believe, in their reasonable discretion and in consultation with

the Committee, do not comply with the Bid Procedures. For purposes hereof, the Agreement

shall constitute a Qualified Bid.

       (h.)   <u>Auction</u>. The Debtors will conduct an auction (the "Auction") to

determine the highest and best bid with respect to the Assets.

      (1)    The Debtors shall provide the Stalking Horse Purchaser and all Qualified Bidders with copies of all Qualified Bids at least twenty-four (24) hours prior to the Auction, which may exclude any confidential financial information, as determined by the Debtors in their reasonable discretion or which has been so designated by the Qualified Bidder. The Debtors propose that the Auction shall commence at 10:00 a.m. (Eastern Time) on May 21, 2009, at the offices of Pachulski, Stang, Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, DE 19899.

      (2)    The Debtors propose that, no later than May 20, 2009, the Debtors will notify all Qualified Bidders of (i) the highest and best Qualified Bid, as determined by the Debtors in the Debtors' discretion (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders and the Committee (if the Stalking Horse Purchaser's Qualified Bid constitutes the Baseline Bid then the sum of (a) Expense Reimbursement and (b) the Breakup Fee shall be added to the Qualified Bid for purposes of the Auction).

      (3)    The Debtors propose that, if no higher and better offer is obtained at the Auction, then the Stalking Horse Purchaser will be deemed the Successful Bidder, the Agreement will be the Successful Bid, and, at the May 22, 2009 Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

      (4)    Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representative of each of the Qualified Bidders, the Debtors, Ableco, B of A, and the Committee shall be permitted to attend.

21

(5)     During the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $500,000 in cash. Except as otherwise set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest and best offer for the Assets.

(6)     Any Overbid after the Baseline Bid shall be made in increments of at least $500,000 in cash. Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash and/or other consideration acceptable to the Debtors, on consultation with Ableco, B of A and the Committee; provided, however, that any overbid Bids by the Stalking Horse Purchaser thereafter shall only be required to be equal to the sum of (1) the then existing lead Bid plus (2) $500,000 less (3) the dollar value of the Breakup Fee less (4) the dollar value of the Expense Reimbursement, provided, further, however, notwithstanding the foregoing any Overbid by a secured lender may be a credit bid under section 363(k) of the Bankruptcy Code, either in full or in part.

(7)     Additional provisions regarding the conduct of the Auction are set forth in the Bid Procedures.

(8)     Upon conclusion of the bidding, the Auction shall be closed, and the Debtors, who may consult with the Committee and their secured lenders with respect hereto, shall immediately identify the highest and best offer for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest and best offer will provide the greatest amount of net value to the Debtors, and the next highest and best offer after the Successful Bid (the "Back-up Bid") and the entity submitting the Back-up Bid (the "Back-up Bidder"), and advise the Qualified Bidders of such determination. If the Purchaser's final bid is deemed to be highest and best at the conclusion of the Auction, the Purchaser will be the Successful Bidder, and such bid, the Successful Bid.

(i.)     <u>Acceptance of Successful Bid</u>. The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the

Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of such Qualified Bid. The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's Designated Contracts thereto, and the Debtors reserve the right to contest any such objection including on the ground that the objector lacks standing, provided, however, that any objection to such assignment on the basis of amounts necessary, pursuant to section 365 of the Bankruptcy Code, to cure all defaults under such objector's Designated Contracts must be made and/or reserved in accordance with the procedures set forth in the order approving these Bid Procedures).

(j.)    Expense Reimbursement and Breakup Fee. The Sellers are authorized without further Court action to pay any amounts that become due and payable to the Stalking Horse Purchaser pursuant to the Agreement (including, without limitation, the Breakup Fee and Expense Reimbursement). Any such amounts shall, pursuant to Section 364(c)(1) of the Bankruptcy Code, constitute a super-priority administrative expense in the Sellers' Chapter 11 cases with priority over all administrative expenses of the kind specified in section 503(b) or 507(a) of the Bankruptcy Code. In addition, upon the consummation of any proposal (other than by the Stalking Horse Purchaser or its Affiliates) relating to (i) any merger, consolidation, business combination, sale or other disposition of 20% or more of the Assets pursuant to one or more transactions, (ii) the sale of 20% or more of the outstanding shares of capital stock or

23

equity interests of any Seller (including, without limitation, by way of a tender offer, foreclosure or plan of reorganization (including a plan of reorganization proposed or advanced by Sellers), merger or liquidation), (iii) the sale or other disposition of any Critical Asset (as defined in the Agreement), or (iv) a similar transaction or business combination involving one or more Third Parties and any Seller (an "Acquisition Proposal") (whether pursuant to a plan of reorganization or otherwise), the Expense Reimbursement and Breakup Fee shall be payable from the proceeds received by the Sellers prior to any distribution thereof to the Sellers' secured lenders.

### Notice of Sale Hearing

19.     The Debtors request that the Court approve the manner of notice of the Sale Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as <u>Exhibit C</u> (the "Sale and Bid Procedures Notice"), which the Debtors will serve on the following parties:

> (a.)     the U.S. Trustee;
>
> (b.)     counsel to the Committee;
>
> (c.)     all parties known to be asserting a lien on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on Sellers' assets;
>
> (d.)     all known counterparties to Assumed Executory Contracts;
>
> (e.)     all entities known to have expressed an interest in bidding on the Assets in accordance with the Bid Procedures Order;
>
> (f.)     the United States Attorney's office;

24

(g.)     all state attorney generals in states in which the Debtors do business;

(h.)     state taxing authorities in the states in which the Debtors do business and the Internal Revenue Service;

(i.)     environmental authorities in the states or smaller applicable jurisdictions in which the Debtors do business;

(j.)     all known counterparties to the Rejected Contracts;

(k.)     parties who are known to have purchased the Sellers' products within the four (4) years prior to the commencement of the Chapter 11 Cases;

(l.)     the Stalking Horse Purchaser and its counsel; and

(m.)     all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bid Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

20.     Additionally, the Debtors propose to serve the Creditor Notice substantially in the form attached hereto as Exhibit D on all known creditors of the Debtors.

21.     The Debtors propose to serve the Sale and Bid Procedures Notice and the Creditor Notice within three (3) Business Days from the date of entry of an order granting the Bid Procedures Motion (the "Bid Procedures Order"), by first-class mail, postage prepaid, on the appropriate parties. Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bid Procedures

25

Order that wishes to obtain a copy of such documents may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, Esquire).

## Sale Hearing

22.     At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Sale of the Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the Permitted Liens as defined in the Sale Motion and except as otherwise provided therein) with all such liens, claims and interests to attach to the proceeds of the Sale, except as otherwise provided with the same validity and in the same order of priority as they attached to the Assets prior to the Sale, including the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code. At the Sale Hearing, the Debtors will also seek an Order rejecting the Rejected Contracts. The Debtors will present additional evidence, as necessary, at the Sale Hearing and submit that the relief sought herein, including the Sale, related assumption and assignment of contracts and leases and the rejection of the Rejected Contracts and any other contracts and leases scheduled in the Agreement to be rejected, is fair, reasonable and in the best interest of its estate.

## Closing

23.     The Closing shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale Hearing.

## Procedures for the Assumption and Assignment of Assumed Agreements

24.    At Closing, the Debtors intends to assume and assign to the Successful Bidder, certain executory contracts and unexpired leases identified on certain schedules to the Agreement (i.e. the "Assumed Executory Contracts").[2] The list of the Assumed Executory Contracts is attached to the Agreement, provided, however, that the Stalking Horse Purchaser may add to the list of Assumed Executory Contracts (so long as the Debtors file and serve the Cure Notice on the Counterparty (defined below) within fifteen (15) calendar days before the Sale Hearing), and may remove any executory contract or lease to the list of Assumed Executory Contracts at any time prior to the Sale Hearing under the Agreement.

25.    The Debtors propose to serve the proposed Cure Notice, in substantially the form annexed hereto as Exhibit E, upon each counterparty whose agreement is on the list of Assumed Executory Contracts no later than ten (10) calendar days after entry of the Order approving the Bid Procedures (but no later than 15 days prior to the Sale Hearing). The Cure Notice also will identify the amounts, if any, that the Debtor believes are owed to each counterparty to a Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Costs"). The Debtors have proposed that the Cure Notice will state the date by which any objection to the Cure Costs or the assumption and assignment of the Assumed Executory Contract (other than with respect to adequate assurance of future performance) must be filed and served, which will be ten (10) days from the date of service of the Cure Notice. If a

---

[2] The inclusion of any agreement in the list of Assumed Executory Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserves the right to challenge the status of any agreement included in the list of Assumed Agreements up until the time of the Sale Hearing.

contract or lease is assumed and assigned pursuant to the Bankruptcy Court's order approving same, then unless the affected counterparty properly files and serves an objection to the Cure Costs contained in the Cure Notice, the counterparty will receive at the time of the Closing (or as soon as reasonably practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made pursuant to the terms of the Agreement, or the agreement of the Successful Bidder. If an objection is filed by a counterparty to an Assumed Executory Contract with respect to the amount of the Cure Costs set forth in the Cure Notice, the Debtors propose that such objection must set forth a specific default under the Assumed Executory Contract and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Notice or, alternatively, state why the counterparty believes any Cure Costs is owing, and state the basis for any other objection to the assumption and assignment of the Assumed Executory Contract (other than with respect to adequate assurance of future performance). The Debtors further propose that an objection to the assignment and assumption of an Assumed Executory Contract with respect to adequate assurance of future performance must be filed and served on or before seven (7) days prior to the Sale Hearing. The Cure Notice also will state such objection deadline and the date, time and place of the Sale Hearing.

26.     The Successful Bidder, shall assume and be responsible for payment of any Cure Costs that may be owed to any counterparty to the Assumed Executory Contracts in accordance with the terms of the Agreement. The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed

28

assignment of any Assumed Executory Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing or in the case of any Assumed Executory Contracts not assumed and assigned to the Successful Bidder at the Sale Hearing, at such other hearing to approve assumption and assignment of such Assumed Executory Contracts. The Debtors further propose that Cure Costs disputed by any counterparty will be resolved by the Court at the Sale Hearing or at such other hearing to approve assumption and assignment of the relevant lease or contract.

27.    Except to the extent otherwise provided in the Agreement or the agreement entered into with the Successful Bidder(s), subject to the payment of any Cure Costs, the assignee of an Assumed Executory Contract will not be subject to any liability to the assigned contract counterparty that accrued or arose before the closing date of the sale of the Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

### Procedures for Rejection of Rejected Contracts

28.    At Closing, the Debtors intends to reject certain executory contracts and unexpired leases identified on certain schedules to the Agreement (i.e. the "Rejected Contracts").

29.    The Debtors propose to serve the proposed Rejection Notice, in substantially the form annexed hereto as Exhibit F, upon each counterparty whose agreement is on the list of Rejected Contracts no later than ten (10) calendar days after entry of the Order approving the Bid Procedures (but no later than 15 days prior to the Sale Hearing). The Debtors

29

have proposed that the Rejection Notice will state the date by which any objection to the rejection of the Rejected Contracts must be filed and served, which will be ten (10) days from the date of service of the Rejection Notice. If a contract or lease is rejected pursuant to the Bankruptcy Court's order approving same, then unless the affected counterparty properly files and serves an objection, such contract or lease shall be deemed rejected at the time of Closing. The Rejection Notice also will state the date, time and place of the Sale Hearing.

**Approval of the Expense Reimbursement,**
**Breakup Fee and Bid Procedures is Appropriate**

30. The Expense Reimbursement, Breakup Fee and the Bid Procedures described herein are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values. The Stalking Horse Purchaser will be the stalking horse for competitive bids, perhaps leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

31. As indicated above, the Debtors hereby request that the Court approve the overbid requirements and Bid Procedures as are customary in similar circumstances, including (a) the Expense Reimbursement; (b) the Breakup Fee, (c) the minimum overbid amount of $1,500,000 plus the purchase price under the Agreement in respect of an offer for all or substantially all of the Assets; (d) bidding increments of $500,000 for all or substantially all of the Assets after the minimum overbid amount; and (e) the other Bid Procedures summarized in this Motion annexed hereto as Exhibit B. The Debtors submit that cause exists to approve such payments and procedures because they are fair and reasonable under the circumstances and will encourage competitive bidding and the highest and best price for the Assets.

30

32.     The Debtors believe that the payment of the Expense Reimbursement and the Breakup Fee under the terms of the Agreement, and the establishment of the Bid Procedures, are reasonable and necessary to induce a purchaser to enter into the transactions encompassed by the Purchase Agreement and thus to enable the Debtors to obtain the highest and best price possible for the Assets.

33.     To compensate the Stalking Horse Purchaser for serving as the stalking horse bidder whose bid will be subject to higher and better offers, the Debtors seek approval of the Expense Reimbursement and the Breakup Fee in accordance with the terms of the Agreement.  The Debtors and the Stalking Horse Purchaser believe that the Expense Reimbursement and the Breakup Fee are reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Stalking Horse Purchaser and the risk to the Stalking Horse Purchaser that a third-party offer may ultimately be accepted, and that approval of the Expense Reimbursement and the Breakup Fee under the terms of the Agreement are necessary to preserve and enhance the value of the Debtors' estates.

34.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement and the Breakup Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in

31

good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

35.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.,* 181 F. 3d 527 (3rd Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates. *See id.* at 533.

36.     The *O'Brien* court identified at least two instances in which bidding incentives such as expense reimbursements and break-up fees may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

32

37.     Whether evaluated under the "business judgment rule" or the Third

Circuit's "administrative expense" standard, the Expense Reimbursement passes muster.  The

Agreement and the Debtors' agreement to pay the Expense Reimbursement pursuant to the terms

are the product of good faith, arm's-length negotiations between the Debtors and Stalking Horse

Purchaser.  The Expense Reimbursement and the Breakup Fee are fair and reasonable in amount,

and are reasonably intended to compensate for the risk to the Stalking Horse Purchaser of being

used as a stalking horse bidder.

38.     Further, the Expense Reimbursement and the Breakup Fee already have

encouraged competitive bidding, in that the Stalking Horse Purchaser would not have entered

into the Agreement without these provisions.  The Expense Reimbursement thus has "induc[ed] a

bid that otherwise would not have been made and without which bidding would [be] limited."

*O'Brien*, 181 F.3d at 537.  Similarly, the Stalking Horse Purchaser's offer provides a minimum

bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the

[Assets will be] sold will reflect [their] true worth." *Id.*

39.     The Bid Procedures are fair and reasonable procedures reasonably

intended to encourage competitive bidding, and the Expense Reimbursement and the Breakup

Fee will permit the Debtors to insist that competing bids for the Assets made in accordance with

the Bid Procedures be materially higher or otherwise better than the Agreement (or competing

agreement), which is a clear benefit to the Debtors' estates.

40.     Furthermore, the Expense Reimbursement and the Breakup Fee, which at

maximum would total less than 5.77% of the Cash Portion of the Purchase Price under the

Agreement, prior to any adjustments thereto, is within the spectrum of expense reimbursement and termination fees approved by bankruptcy courts in chapter 11 cases. *See e.g., In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break up fee of approximately 4 %, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp.*, et al., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Anchor Container Corp. et, al.*, Case Nos. 96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (Court approved termination fee of 2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of Debtors' assets); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of Debtors' assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of Debtors' entertainment division); In re Continental Airlines, Inc., Case No. 90-932 (HSB) (Bankr. D. Del.) (Court approved breakup fee of 2.4%, or

$1,500,000, in connection with $61,000,000 sale transaction). Moreover, the Stalking Horse Purchaser is expected to mitigate the Debtors' substantial prepetition warranty obligations through expenditures estimated at $25 million towards such obligations, although without obliging itself to such obligations. Taking account of that cost of the transaction for the Stalking Horse Purchaser, the Expense Reimbursement and the Breakup Fee, at maximum would total less than 3.9% of such cost and the Purchase Price under the Agreement, prior to any adjustments thereto.

41. For the reasons set forth above, the Debtors respectfully request approval of: (a) the proposed overbid protections including the Expense Reimbursement and the Breakup Fee; (b) the Bid Procedures for the conduct of overbidding, the Auction and selection of the Successful Bidder(s); (c) the procedures set forth herein for notice to counterparties under executory contracts and leases proposed to be assumed and assigned or rejected in connection with the proposed sale, and the determination and payment of Cure Costs to the counterparties to leases or contracts to be assumed and assigned; (d) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (e) the related relief sought hereby.

## No Prior Request

42. No prior request for the relief sought in this Bid Procedures Motion has been made to this or any other court.

## Notice

43. Notice of this Motion either has been or will be given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee,

(ii) the Debtors' prepetition and postpetition secured lenders, (iii) the Committee, and (iv) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: April 24, 2009

PACHULSKI STANG ZIEHL & JONES LLP

_Jarnes E O'Neill_

Laura Davis Jones (DE Bar No. 2436)
Robert B. Orgel (CA Bar No. 101875)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (DE Bar No. 4042)
Victoria A. Newmark (CA Bar No. 183581)
Timothy P. Cairns (Bar No. 4228)

919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
email:      ljones@pszjlaw.com
            rorgel@pszjlaw.com
            mpagay@pszjlaw.com
            vnewmark@pszjlaw.com
            tcairns@pszjlaw.com

Counsel for Debtors and Debtors in Possession

36