IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MONACO COACH CORPORATION, et al.,[1] | ) | Case No. 09-10750-KJC |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**DEBTORS' MOTION FOR AN ORDER: (I) APPROVING ASSET PURCHASE
AGREEMENT AND AUTHORIZING THE SALE OF ASSETS OUTSIDE THE
ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS
PURSUANT TO SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE;
(III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (IV) AUTHORIZING THE
REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
(V) AUTHORIZING CERTAIN DEBTORS TO CHANGE THEIR NAMES
POST-CLOSING; AND (VI) GRANTING RELATED RELIEF**

Monaco Coach Corporation, *et al.*, the above-captioned debtors and debtors in possession

(collectively, the "Debtors"), file this motion (this "Sale Motion") for entry of an Order

(i) Approving Asset Purchase Agreement and Authorizing the Sale of Assets Outside the

Ordinary Course of Business; (ii) Authorizing the Sale of Assets Free and Clear of All Liens,

Claims, Encumbrances and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy

Code; (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
number, if applicable, are: Monaco Coach Corporation (0244); Signature Motorcoach Resorts, Inc.
(8980); Naples Motorcoach Resort, Inc. (1411); Port of the Isles Motorcoach Resort, Inc. (8524); Outdoor
Resorts of Las Vegas, Inc. (8478); Outdoor Resorts Motorcoach Country Club, Inc. (1141); Signature
Resorts of Michigan, Inc. (4020); La Quinta Motorcoach Resorts, Inc. (9661); R-Vision Holdings L.L.C.
(2820); R-Vision, Inc. (3151); R-Vision Motorized, LLC (1985); Bison Manufacturing, LLC (0778) and
Roadmaster LLC (5174). The address for each of the Debtors is 91320 Coburg Industrial Way, Coburg,
OR 97408, with the exceptions of R-Vision, Inc., R-Vision Motorized, LLC, Bison Manufacturing, LLC
and Roadmaster LLC, for which the address is 606 Nelson's Parkway, Wakarusa, IN 465733060; and La
Quinta Motorcoach Resorts, Inc., for which the address is 80-501 Ave 48, Indio, CA 92201.

Unexpired Leases; (iv) Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases; (v) Authorizing Certain Debtors to Change Their Names Post-Closing; and (vi) Granting Related Relief.

On April 24, 2009, the Debtors filed the *Motion for Order (A) Approving Bid Procedures For the Sale of the Debtors' Assets; (B) Scheduling An Auction and Hearing To Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Establishing Procedures Relating to the Rejection of Certain Contracts; (E) Approving Certain Expense Reimbursement Provisions and Breakup Fee; and (F) Granting Other Related Relief* (the "Bid Procedures Motion"), which seeks approval of certain sale and bidding procedures for the sale, as more particularly set forth therein (the "Bid Procedures"). The sale, approval of which is sought by this Sale Motion (the "Sale"), shall be to the highest and best bidder or bidders (a "Successful Bidder"), at the auction provided for in the Bid Procedures Motion and the Bid Procedures (the "Auction"), to take place on the date set forth in, and in accordance with, the order to be entered by the Court on the Bid Procedures Motion (the "Bid Procedures Order").

In support of this Sale Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.       This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§§ 157(b)(2)(A), (M), (N) and (O).

2.       Venue of these proceedings and this Sale Motion is proper in this District

pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory predicates for the relief sought herein are sections 105, 363,

365, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules").

## Compliance With Local Rule 6004-1

4.       A copy of the proposed purchase agreement, or a form of such agreement

substantially similar to the one the debtor reasonably believes it will execute in connection with

the proposed sale:  A copy of the proposed asset purchase agreement is attached hereto as

Exhibit A.

5.       A copy of the proposed form of sale order:  A copy of the proposed form

of sale order is attached hereto as Exhibit B.

6.       A request, if necessary, for the appointment of a consumer privacy

ombudsman under Bankruptcy Code section 332:  The Debtors do not have a published privacy

policy and thus it is not necessary to seek the appointment of a consumer privacy ombudsman in connection with the Sale.

      7.   <u>Material Terms</u>:

      (i) *Sale to an insider*:

Neither the Stalking Horse Purchaser nor the guarantor, Navistar, Inc. ("Navistar") are insiders. Nonetheless, there are various relationships between Navistar, Inc. or its subsidiaries and affiliates ("Navistar Entities") and the Debtors. The Navistar Entities are debtors and creditors of the Debtors and Navistar's Chief Executive Officer, Daniel C. Ustian, is a director of Monaco Coach Corporation ("ParentCo"), although he has not participated in any meetings of the ParentCo Board from the time of Navistar's expressing serious interest in an acquisition transaction. Moreover, in the first quarter of 2007, ParentCo entered into a joint venture with International Truck and Engine Corporation (n/k/a Navistar, Inc.) ("ITEC"), a subsidiary of Navistar, and became the 49% owner of Custom Chassis Products, LLC, a Delaware limited liability company ("CCP") as to which ITEC is the 51% owner. As to CCP, it leases one of the Debtors' Elkhart, Indiana facilities under a lease guaranteed by Navistar Entities, which facility is included in the proposed sale. CCP is engaged primarily in the manufacture of diesel chassis and the Debtors are both its largest customer and vendor.

      (ii) *Agreements with Management*:

The Stalking Horse Purchaser has not to date entered into any employment agreements with members of the Debtors' management. Pursuant to the Agreement, the

Debtors have agreed to cooperate with efforts by the Stalking Horse Purchaser to hire the Debtors' employees to work for the Stalking Horse Purchaser post-closing. To the extent that agreements are entered into with the Debtors' management that contemplate employment post-closing, the Debtors will make appropriate disclosures at the Sale Hearing.

(iii) *Releases*:

Claims to be paid under the Agreement include cure payments, which are to be made by the Stalking Horse Purchaser, on behalf of the Debtors, to holders of assumed executory contracts and leases, pursuant to, *inter alia*, Section 2.6 of the Agreement, and such payments shall reduce the purchase price dollar-for-dollar up to a set maximum amount. Additionally, Section 2.2(a)(ii) contemplates that the Stalking Horse Purchaser may pay up to $2,000,000 of the Debtors' liabilities "(such as trade or accounts payable with key suppliers and/or certain rebates to dealers)" as a credit against the purchase price. Further, Section 6.1(a) requires the Debtors to use commercially reasonable efforts to obtain, among other things, the Sale Order, which is defined to mean the order of the Court, *inter alia*, providing for a full release of Purchaser with respect to the Unassumed Liabilities.

(iv) *Private Sale/No Competitive Bidding*:

An auction is to occur with respect to the sale in as requested by the Bid Procedures Motion.

(v) *Closing and Other Deadlines*:

The Agreement was executed on April 23, 2009 (the "Agreement Date"). Section 8.2(a) of the Agreement provides that the Bid Procedures Order shall have been entered as soon as practicable and no later than the 21st day after the Agreement Date and the Sale Order shall have been entered as soon as practicable thereafter and no later than the 45th day after the Agreement Date. The interim cash collateral order entered March 27, 2009 in these Chapter 11 Cases contemplates a budget expiring June 1, 2009. Section 11.1 contemplates that either party, absent its breach, can terminate the transaction if not closed within 50 days after the Agreement Date (the "Drop Dead Date"), provided, however, that the Stalking Horse Purchaser may extend the Drop Dead Date to up to 75 days after the Agreement Date under certain limited circumstances.

(vi) *Good Faith Deposit*:

No deposit is applicable as to the Stalking Horse Purchaser.

(vii) *Interim Arrangements with Proposed Buyer*:

There are no provisions for operation or management of the Debtors by the Stalking Horse Purchaser prior to Closing.

(viii) *Use of Proceeds*:

Pursuant to the interim cash collateral order entered March 27, 2009 in these Chapter 11 Cases, Ableco Finance, LLC ("Ableco") and Bank of America, N.A., as Agent ("B of A") have security interests and replacement liens in all or essentially all of the estates' assets other than avoidance actions. At the request of Ableco and B of A, the Agreement may be modified to specify the division of proceeds between them, although

there is not necessarily agreement with them yet as to either the split itself or the designation of amounts and deductions.

(ix) *Tax Exemption*: No tax exemption under bankruptcy law is sought.

(x) *Record Retention*:

Section 12.9 of the Agreement provides that for a period of 24 months after the Closing Date (or such shorter period as Debtors maintain their corporate existence), the Debtors and Purchaser shall have reasonable access to all of the Books and Records relating to the Business or the Assets, including all employee records or other personnel and medical records required by law to the extent that such access may reasonably be required by such party.

(xi) *Sale of Avoidance Actions*:

No sale of Avoidance Actions is included in the transaction.

(xii) *Requested Findings as to Successor Liability*:

The transaction documents contemplate that, except as to Assumed Obligations, the Stalking Horse Purchaser will purchase the Assets free and clear of all pre-closing liabilities under successor liability theories, including without limitation all environmental, products liability and employment liabilities. Specifically, the proposed Sale Order contains findings that: (a) the transactions contemplated under the Agreement do not amount to a consolidation, merger or *de facto* merger of the Stalking Horse Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Stalking Horse Purchaser and the Debtors, there is no common identity

between the Debtors and the Stalking Horse Purchaser, there is no continuity of enterprise between the Debtors and the Stalking Horse Purchaser, the Stalking Horse Purchaser is not a mere continuation of the Debtors or their estates, and the Stalking Horse Purchaser does not constitute a successor to the Debtors or their estates; (b) the Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and, except as expressly provided in or pursuant to the Agreement, the Stalking Horse Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise expressly provided in the Agreement, and the Sale Motion contains sufficient notice of such limitation in accordance with Local Rule 6004-1. Except to the extent the Stalking Horse Purchaser assumes the Assumed Obligations pursuant to the Agreement, neither the purchase of the Assets by the Stalking Horse Purchaser or its affiliates, nor the fact that the Stalking Horse Purchaser or its affiliates are using any of the Assets previously operated by the Debtors, will cause the Stalking Horse Purchaser or any of its affiliates to be deemed a successor in any respect to the Debtors' businesses within the meaning of (i) any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations) for purposes of this provision, the term "affiliate" shall mean each entity

that is treated as a single employer with the Stalking Horse Purchaser for purposes of Section 414 of the Code, (ii) under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtors are a party, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (v) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (vi) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42

U.S.C. § 9601 et seq., (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes of any kind for any period, (viii) any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Assets prior to Closing, (ix) any liabilities, debts, commitments or obligations arising from laws, rules or administrative orders regarding the Debtors' relationships with vehicles dealers or distributors and (x) any litigation; and; (c) except to the extent expressly included in the Assumed Obligations or to enforce the Agreement, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, the Debtors, the Committee, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Assets to the Stalking Horse Purchaser, shall be forever barred, estopped and enjoined from asserting or otherwise prosecuting or pursuing such Lien, whether by payment, setoff, or otherwise, directly or indirectly, against the Stalking Horse Purchaser or any affiliate, successor or assign thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates,

financial advisors and representatives (each of the foregoing in its individual capacity), or the Assets. Section X, 17, 34 & 37 of the Sale Order.

       (xiii)   *Sale Free and Clear of Unexpired Leases*:

The sale is to be free and clear of all Liens (except Permitted Liens) and Unassumed Liabilities, including "any leasehold interest, license or other right, in favor of a Third Party or a Seller, to use any portion of the Acquired Assets."

       (xiv)  *Credit Bid*:

The Bid Procedures permit secured lenders to submit credit bids for the Assets. The Debtors do not know of any intended credit bids for the Assets, but reserve the right to seek approval of a credit bid at the Sale Hearing to the extent that such credit bid qualifies under the Bid Procedures and constitutes the highest and best bid for the Assets.

       (xv)  *Relief From Bankruptcy Rule 6004(h)*:

The proposed Sale Order provides that, notwithstanding Bankruptcy Rules 6004, 6006 and 7062, the Sale Order shall be effective and enforceable immediately upon entry. Sale Order ¶ 45. The Debtors believe that relief from Bankruptcy Rule 6004(h) is appropriate to enable the proposed transaction to close promptly. As set forth in this Sale Motion and the Bid Procedures Motion and Bid Procedures Order, the Debtors are ensuring that all parties in interest will receive ample notice and opportunity to object at the Sale Hearing.

## **Background**

8.      On March 5, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.      No request has been made for the appointment of a trustee or an examiner in this case.

10.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the *Declaration of P. Martin Daley in Support of First Day Motions* (the "Daley Declaration"), previously filed in these cases and incorporated herein by reference.

11.     In order to maximize the value of their business and assets for the benefit of creditors, the Debtors in the exercise of their business judgment, have determined to market and sell the Assets (as such term is defined below) to the highest and best bidder(s) at auction, for the benefit of the estates and their creditors. In addition to the contemplated sales of the Assets described herein, the Debtors also are pursuing sales pursuant to one or more auctions with respect to (i) the Debtors' RV resorts business and unimproved real property in La Quinta, California and (ii) machinery and equipment and industrial property not included in the instant Sale.

### Marketing Process

12.     In or about December 2008, the Debtors initiated a process to solicit bids ("Bids") for the Debtors' core RV manufacturing business and engaged investment banker

Imperial Capital, LLC ("Imperial Capital") for that purpose. As of the date of this Motion, Imperial Capital has contacted approximately 47 parties on behalf of the Debtors, including around 31 potential financial buyers and approximately 16 potential strategic buyers and other interested parties. Of these interested parties, around 33 have executed confidentiality agreements to date.

13.     The Debtors, with the assistance of Imperial Capital and their other professionals, intend to market and seek Bids for the Assets and, pursuant to the Bid Procedures, to hold the Auction of such assets in May 2009 on the date specified by the Court. The Debtors believe that such marketing of their assets over the period contemplated by the Bid Procedures, combined with the approximately 4-month marketing period that has already elapsed, will result in the highest or otherwise best price for those assets.

Agreement With the Stalking Horse Purchaser

14.     On April 22, after extensive negotiations, the Debtors entered into an Asset Purchase Agreement (the "Original Agreement") with Workhorse International Holding Company (the "Stalking Horse Purchaser") and Navistar, Inc. ("Navistar"), as guarantor. On April 23, 2009, the Debtors, the Stalking Horse Purchaser and Navistar entered into an Amended and Restated Agreement (the "Agreement"). A copy of the Agreement is attached hereto as Exhibit A. Pursuant to the terms of the Agreement, the Stalking Horse Purchaser, subject to a court approved auction and sale process and the submission of higher and better offers, will purchase the Assets and receive assignment of certain contracts and leases.

15.     The Debtors, subject to a court approved auction and sale process and higher and better offers, intend to sell the Assets to the Stalking Horse Purchaser pursuant to the Agreement. The Stalking Horse Purchaser will acquire the Assets free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, on the terms set forth in the Agreement, which are summarized below.

16.     The Debtors believe that the consummation of the Sale to the Stalking Horse Purchaser or to a successful overbidder will provide their creditors and other stakeholders with the best opportunity possible for maximizing value by realizing upon the Assets through a sale as a going concern.

## The Terms of the Agreement

17.     The terms of the Stalking Horse Purchaser's offer to purchase the Assets are set forth in the Agreement, and are summarized below. The description below only summarizes certain provisions of the Agreement, and the terms of the Agreement control in the event of any inconsistency.

     a.    **Purchase Price**. The aggregate purchase price for the Assets (the "Purchase Price") shall be (i) an amount equal to $52,000,000 (the "Estimated Cash Portion") <u>minus</u> (A) the sum of (x) sixty percent (60%) of the amount (if any) by which the RV Finished Goods Inventory (as defined in the Agreement) of Sellers as of the Closing Date as shown on the Closing Statement (as defined in below) (the "Closing RV Finished Goods Inventory") is less than the Baseline RV Finished Goods Inventory (as defined in the Agreement), (y) sixty-three percent (63%) of the amount (if any) by which the Chassis Inventory (as defined in the Agreement) of Sellers as of the Closing Date as shown on the Closing Statement (the "Closing Chassis Inventory") is less than the Baseline Chassis Inventory (as defined in the Agreement), (z) twenty-nine percent (29%) of the sum of (I) the amount (if any) by which the RV Raw Material Inventory (the defined in the Agreement) of Sellers as of the Closing Date as shown on the Closing Statement (the "Closing RV Raw Material Inventory") is less than the Baseline RV Raw Material Inventory (as defined in the

Agreement) and (II) the amount (if any) by which the RV WIP Inventory (as defined in the Agreement) of Sellers as of the Closing Date as shown on the Closing Statement (the "Closing RV WIP Inventory") is less than the Baseline RV WIP Inventory (as defined in the Agreement) (the sum of the amounts described in subclauses (I) and (II) being referred to as the "Combined Raw and WIP Shortfall"), minus (B) the net book value of any Missing Equipment as shown on the Closing Statement, minus (C) the amount of Cure Payments made by the Purchaser on behalf of Sellers pursuant to Section 2.6 of the Agreement; provided, however, that the aggregate amount of such Cure Payments shall not exceed $550,000, minus (D) the Section 2.2(a)(ii) Liabilities minus (E) the amounts Purchaser is entitled to deduct from the Purchase Price under Section 6.10, Section 6.16 or any other Section of the Agreement (the amount in subsection (i) above, the "Cash Portion"), and (ii) the assumption of the Assumed Obligations.

Notwithstanding anything to the contrary above, the Estimated Cash Portion shall be reduced (i) in the case of the Closing RV Raw Material Inventory and the Closing RV WIP Inventory, only if and to the extent that the Combined Raw and WIP Shortfall exceeds $500,000 (on a gross basis before application of the 29% factor referred to above) and (ii) in the case of Missing Equipment, only if and to the extent that the net book value of the Missing Equipment exceeds $500,000. *See* Agreement §§ 3.1(a) and (b).

b.  **Assets.** All properties, assets, rights, titles and interests of every kind and nature, of Sellers (including indirect and other forms of beneficial ownership) as of the Closing Date, which are used in or related to the activities carried on by Sellers and any of their Affiliates relating to the design, manufacture, marketing, distribution and sale of gasoline and diesel-powered motorhomes, towable recreational vehicles, and chassis, including the Bison Trailer Business, but excluding the Roadmaster Cargo Trailer Business and the Motorhome Resorts Business (the "Business"), whether tangible or intangible, real or personal and wherever located and by whomever possessed, including, without limitation, all of the following assets but excluding Excluded Assets (as defined below), as described in further detail in the Agreement: all Intellectual Property used in or related to the Business; all trademarks, service marks, logos, slogans, trade names, and corporate names (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names incorporating "Roadmaster", "R-Sport" or any derivations therefrom and all goodwill associated with any of the foregoing, together with all income, royalties, damages and payments due or payable to Sellers as of the Closing or thereafter; all trademarks, service marks, logos, slogans, trade names, and corporate names (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names incorporating "Signature Resorts Design" logo or any derivations therefrom and all goodwill associated with any of the foregoing, together with all income, royalties, damages and payments due or payable to Sellers as of the Closing or thereafter; all of Sellers' rights existing under the Assumed Executory Contracts set forth on Schedule 2.1(a)(iv) of the Agreement; all Acquired Owned Real Property set forth on Schedule 2.1(a)(v) of the Agreement; all supplier based tooling, wherever located;

all signage and other materials incorporating the logos, trademarks, trade names, corporate names, service marks, or brand designations of Sellers, which are owned by any Seller but are leased or otherwise held by Monaco Dealers (as defined in the Agreement); all computer systems, including software, hardware, networks and interfaces owned or leased by Sellers which are used in, or held for use in, the Business ("Systems"); all leasehold improvements and all machinery, tooling (including all tooling and "old" molds for former models), equipment (including all transportation, vehicles, testing equipment and office equipment), fixtures, trade fixtures, computer equipment and hardware, telephone systems, network systems and furniture owned by Sellers and, in each case, used in or related to the Business, wherever located; all Inventory used in or related to the Business; all office supplies, production supplies and other supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind used in or related to the Business; all RV show deposits related to the Business; all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) related to the Assets or the Business (other than those related to the Excluded Assets or the Excluded Liabilities); the right to receive and retain mail and other communications used in or related to the Business; all deposits and prepayments held by Third Parties pursuant to any Assumed Executory Contract; all Books and Records used in or related to the Business; all advertising, marketing and promotional materials and all other printed or written materials used in or related to the Business; all transferable Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies, used in or related to the Business; all goodwill as a going concern and all other intangible properties used in or related to the Business; all telephone numbers and IP addresses used in or related to the Business; all promotional allowances, vendor rebates and similar items related to the Business; the rights to make claims and to receive proceeds under insurance policies to the extent related to an Asset or the Business or to the extent a liability is asserted against Purchaser or any of its Affiliates in connection with the Assets or the Business; Monaco Coach Corporation's membership in the Recreation Vehicle Industry Association ("RVIA") and all deposits previously paid to RVIA associated with such membership; and all security deposits relating to Assumed Executory Contracts. *See* Agreement § 2.1.

c.    **Excluded Assets.** Notwithstanding anything to the contrary in the Agreement, the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to the Purchaser (all of the following are referred to collectively as the "Excluded Assets"): any and all rights under the Agreement and avoidance claims or causes of action arising under the Bankruptcy Code or applicable state law, including, without limitation, all rights and avoidance claims of Sellers arising under chapter 5 of the Bankruptcy Code; all Owned Real Property and any other interests in real property in each case, other than the Acquired Owned Real Property (each as defined in the Agreement); all leases of Sellers other than the Assumed Equipment Leases (the "Excluded Leases") and all Contracts other than the Assumed Executory Contracts (the "Excluded Contracts"); any asset

or Contract set forth on Schedule 2.3(c) to the Agreement; <u>provided</u> that the Purchaser may amend the Disclosure Schedules setting forth the Assets and the Excluded Assets attached to the Agreement at any time on or before five (5) days prior to the Closing Date in order to exclude from the definition of Asset, and include in the definition of Excluded Asset, any other asset, lease or Contract not otherwise excluded, as the case may be; <u>provided, however</u>, that such exclusion shall not serve to reduce or otherwise affect the amount of the Purchase Price; all cash (including, without limitation, checking account balances, certificates of deposit and other time deposits and petty cash) ("Cash") and marketable and other securities; the prepayments and deposits other than those included in Section 2.1(a) of the Agreement and all claims, indemnities, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment other than those included in Section 2.1(a); all of Sellers' accounts and notes receivable (whether current or noncurrent) and all causes of action specifically pertaining to the collection of the foregoing; all assets, properties, rights, titles and interests, all Inventory and all Intellectual Property, used exclusively in connection with the operation of the Roadmaster Cargo Trailer Business; any aircraft hangers or related assets (including any aircraft) owned, leased or guaranteed by any Seller, wherever located; all assets, rights, titles and interests, all Inventory and all Intellectual Property, used exclusively in connection with the operation of the Motorhome Resorts Business, including land held as inventory, wherever located; all machinery, tooling, equipment, trade fixtures, computer equipment and hardware, telephone systems, network systems and furniture owned by Sellers and not used in or related to the Business or set forth on Schedule 2.3(k) to the Agreement (if any); all of Sellers' Tax refunds, rebates, credits and similar items relating to any period, or any portion of any period, on or prior to the Closing Date; U.S. intent-to-use trademark application for NAUTICA (serial number 77/188276 filed on 5/23/2007) and all goodwill associated therewith; all real and tangible personal property presently located at the 4505 Monaco Way, Wildwood, Florida 34785 Owned Real Property (the "Wildwood Assets"); provided, however, that the Wildwood Assets; income Tax Returns of Sellers and related materials; the equity securities or other ownership interest of any Seller; and he equity securities or other ownership interest of any of Sellers' Affiliates. *See* Agreement § 2.3.

d.  **Assumed Obligations**.  Subject to the terms and conditions set forth in the Agreement, the Purchaser shall only assume from Sellers and thereafter be responsible for the payment, performance or discharge of the following liabilities and obligations of Sellers (all such liabilities and obligations herein called the "Assumed Obligations"):  obligations under the Assumed Executory Contracts first arising after the Closing (but excluding liabilities for breaches of such contracts or commitments occurring prior to the Closing Date); and up to $2,000,000 in other liabilities (such as trade or accounts payable with key suppliers and/or certain rebates to dealers), if any, expressly set forth on Schedule 2.2(a)(ii) attached to the Agreement, which shall reduce the Cash Portion on a dollar-for-dollar basis in accordance with Section 3.1(a)(i)(D) of the Agreement (the "Section 2.2(a)(ii) Liabilities"). *See* Agreement § 2.2.

e.    **Excluded Liabilities**. Pursuant to the terms and provisions of the Agreement, the Purchaser will not assume, or in any way be liable or responsible for, any Liability or obligation of any Seller (including Liabilities relating to (x) Excluded Assets and (y) the pre-petition or post-petition (but pre-Closing) operation of the Business or the Assets (and the use thereof), whether relating to or arising out of the Business, the Excluded Assets or the Assets or otherwise, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due, other than the Assumed Obligations. *See* Agreement § 2.4.

f.    **Contracts to be Assumed and Assigned**. The Sellers shall assume and assign to the Purchaser pursuant to section 365(a) of the Bankruptcy Code all Contracts identified in Schedule 2.1(a)(iv) attached to the Agreement under the heading "Assumed Contracts," other than those excluded by the Purchaser from the Assets pursuant to Section 2.3(d) of the Agreement and all equipment leases identified in Schedule 2.1(a)(iv) attached to the Agreement under the heading "Assumed Equipment Leases," other than those excluded by Purchaser from the Assets pursuant to Section 2.3(d) of the Agreement.

g.    **Contracts to be Rejected**. It is a condition of the Purchaser's obligations under the Agreement that (i) the Debtors file a motion(s) to reject (the "Rejection Motion"): (x) all agreements between a Seller and any Person authorized by any Seller to be a dealer of, or granted the right to purchase for resale Sellers' gasoline and diesel-powered motorhomes, and towable recreational vehicles and (y) all other Contracts listed on Schedule 8.8 attached to the Agreement (collectively, the "Rejected Contracts"), and (ii) the Court has issued an Order approving such Rejection Motion. *See* Agreement § 8.8.

h.    **Closing.** The closing of the transactions under the Agreement (the "Closing") shall take place no later than the first business day after the date on which the conditions set forth in Article VIII and Article IX have been satisfied or waived in writing; or on such other date or place as the Purchaser and ParentCo may determine (the "Closing Date"). *See* Agreement § 10.1.

i.    **Representations and Warranties**. The Agreement contains standard representations and warranties for a transaction of this nature. *See* Agreement, Arts. IV & V.

j.    **Change of Names**. The Agreement provides that, except as expressly permitted in the Roadmaster Trademark License Agreement or the Signature Resorts Design License Agreement (each as defined in the Agreement), the Sellers shall not, and shall cause their Affiliates not to, use or license or permit any third party to use any trademark, service mark, logo, slogan, trade name, corporate name or Internet domain name that is likely to cause confusion with the trademarks set forth on Schedule 4.19(a) attached to the Agreement or that includes, or is similar or deceptively similar to, the name "Monaco," "Bison," "R-Vision," or "Roadmaster" (collectively, the "Monaco Marks"). The Agreement

further provides that, within ten (10) days following the Closing Date, Sellers shall file, and shall cause their Affiliates to file, all documentation necessary to change their respective corporate names so as to comply with the foregoing requirements and shall, and shall cause their Affiliates to, remove from their respective assets, properties, stationery, literature and Internet website any and all Monaco Marks except as expressly permitted in the Roadmaster Trademark License Agreement or the Signature Resorts Design License Agreement. In the event that Sellers or their Affiliates breach the foregoing provisions, Purchaser shall be entitled to specific performance and to injunctive relief against further violations, as well as any other remedies at law or in equity available to Purchaser. *See* Agreement § 12.7.

k.   **Consent to CCP Transactions**. The Agreement provides that ParentCo consents to the following actions at CCP and shall, and shall cause its representatives on the board of managers of CCP to, support and take all actions reasonably necessary to complete the following as soon as reasonably practicable: (1) the acquisition by Purchaser or one of its Affiliates and/or by one or more third parties approved by the board of managers of CCP of the machinery, equipment, tooling and other assets of CCP at a price equal to fair market value (as determined by the board of managers of CCP (and approved by the unitholders) or by an appraisal conducted by an independent appraisal or valuation firm selected by Purchaser) for cash or such other form of consideration as the board of managers of CCP may approve (and approved by the unitholders) and (2) following such acquisition, the orderly liquidation of CCP (including through a proceeding under Chapter 11 or Chapter 7, if requested by Purchaser). The foregoing covenants shall be binding on the Parties and shall remain in full force and effect regardless of whether or not the Closing occurs or the Parties' other obligations under the Agreement are terminated. *See* Agreement § 6.14.

l.   **Permitted Liens**. As set forth above, the Sale shall be free and clear of all Liens except for the Assumed Obligations and the following (the "Permitted Liens"): (i) statutory liens for Taxes on real property that are not yet delinquent, (ii) easements, covenants, conditions, restrictions and other matters of record affecting real property, leasehold estates or personalty or any interest therein (excluding any rights of appeal from the Sale Order) that (a) appear on the lender title insurance policies concerning such Owned Real Property issued to Bank of America, N.A. and Ableco Finance LLC in November 2008, (b) appear on the title reports or commitments obtained by Purchaser on or prior to the date of this Agreement in connection with the transaction contemplated by this Agreement or (c) do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use, ownership or operation of the property subject thereto in the Business, excluding Liens that will be removed and stricken as against the Acquired Assets pursuant to the Sale Order, (iii) the effect of any building and zoning regulations, now existing or hereafter in effect with respect to the Owned Real Property that are not violated by the current use of the Owned Real Property, (iv) oil, mineral and/or water rights, and claims of title thereto, shown by the public records, and (v) discrepancies, conflicts in boundary lines, shortages in area or

encroachments which an inspection or survey of the Owned Real Property would disclose. See Agreement §§ 1.1 & 2.1(a).

18.     The Debtors seek authority to sell the Assets to the Stalking Horse Purchaser, or to a higher and better bidder or bidders pursuant to the Sale Order.

19.     The Debtors believe that the sale of the Assets as a going concern to the Stalking Horse Purchaser or a higher and better bidder determined in accordance with the Bid Procedures is far preferable to a piecemeal liquidation of the Debtors' assets. The Debtors further believe that their obtaining the Stalking Horse Purchaser as a stalking horse bidder, marketing their Assets with the assistance of Imperial Capital LLC and their other professionals over approximately 4 months, and holding the Auction of such Assets on the date specified by the Court, in May, 2009, will result in the highest and best price for the Assets.

20.     The Debtors have examined the alternatives to a going concern sale of their assets and have determined that, in light of their financial situation and liquidity needs, a viable alternative to such a sale is not available. In addition, the Debtors' efforts to sell a major portion of their assets, as provided by this Motion, is a milestone requirement of the interim order for use of cash collateral entered March 27, 2009 for the Debtors' use of cash collateral in the Chapter 11 cases, which condition includes that the sale must be consummated by June 1, 2009.

21.     For the reasons stated above, and in light of the obvious benefits to the estates, the Debtors' Boards of Directors have determined, in the exercise of their business judgment, to consummate the proposal submitted by the Stalking Horse Purchaser under the

Agreement or, if applicable, another bidder in the event that the Debtors receives a higher and better bid to the one proposed by the Stalking Horse Purchaser.

## Relief Requested

22.     The Debtors are requesting that this Court, *inter alia*, (i) authorize the sale of the Assets to the Stalking Horse Purchaser pursuant to the Agreement, or, alternatively, to the other Successful Bidder(s) pursuant to such competing agreement(s) with such other Successful Bidder(s) entered into in accordance with the Bid Procedures Order, free and clear of all liens, claims, encumbrances or other interests pursuant to sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, with such liens, claims, rights, interests and encumbrances (collectively, the "Interests") to attach to the sale proceeds of the Assets with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; (ii) approve the assumption and assignment of the Assumed Executory Contracts (as hereinafter defined) under Bankruptcy Code section 365, subject to, and at the time of, closing under the Agreement; (iii) approve the rejection of the Rejected Contracts, subject to, and at the time of, closing under the Agreement; (iv) authorize certain Debtors to change their names post-closing; and (v) grant such other relief as may be necessary or appropriate.

## Basis for Relief

### A.     Approval of the Sale

23.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that

"[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

24. A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F. 3d 389, 395 (3rd Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F. 2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F. 2d 143 (3rd Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F. 2d 1063 (2nd Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991). The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the Property; and whether the asset is decreasing or increasing in value. 124 B.R. at 176.

25. The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

26.     The Debtors have proposed the sale of the Assets after thorough consideration of all viable alternatives and have concluded that the sale is supported by a number of sound business reasons.

27.     The Debtors, with the assistance of Imperial Capital, will have marketed the Assets for approximately 4 months prior to the proposed date of the Sale Hearing and have proposed Bid Procedures designed to maximize the purchase price that should be realized from the sale of the Assets.

28.     The Debtors have articulated sound business reasons, set forth above, for a sale of the Assets on an expedited basis. *See, e.g.*, *In re Tempo Tech.*, 202 B.R. 363, 369-70 (D. Del. 1996) (approving a sale of all of the debtor's assets, within a month after the petition date, where the debtor faced a cash shortfall, operated in an industry where there were few potential buyers, and anticipated continuing losses and a decline in value of the bankruptcy estates); *Delaware & Hudson Railway*, 124 B.R. at 177 (affirming the bankruptcy court's approval of a sale of substantially all of the debtor's assets where the debtor would have been "in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan"); *Titusville Country Club*, 128 B.R. at 400 (granting an expedited hearing on a motion to approve a sale as a result of "deterioration" of the debtor's assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361, 366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to section 363(b) just five weeks after the petition date where the debtor was suffering operating losses).

29. The Debtors believe that, as a result of the marketing efforts that have been undertaken and that they will continue to undertake, the highest and best offer(s) obtained through the proposed Bid Procedures and Auction will provide maximum value to the Debtors under the current circumstances. Other potential buyers will be served with this Sale Motion. The fairness and reasonableness of the consideration to be paid by the Successful Bidder(s) is demonstrated by the marketing efforts that the Debtors will undertake, followed by a fair and reasonable sale process including the Auction, and culminating in one or more proposed sales.

30. The sale of the Assets is supported by sound business reasons and is in the best interests of the Debtors and their estates. Accordingly, the Debtors request approval under Bankruptcy Code section 363(b) of the Sale to the Successful Bidder(s), as set forth herein.

**The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code For a Sale Free and Clear of Liens, Claims, and Interests**

31. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell Property under subsection (b) or (c) of this section free and clear of any interest in such Property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such Property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such Property is to be sold is greater than the aggregate value of all liens on such Property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

32.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F. 3d 252, 259 (3rd Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F. 3d at 258. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the Property." *Id.* at *258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F. 3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F. 3d at 258.

33.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all the Interests, except with respect to any Interests that constitute Assumed Liabilities under the Agreement. *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtors submit that each Interest that is not an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to

the proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the Assets to the Successful Bidder(s), free and clear of all Interests except for the Interests that are Assumed Liabilities under the express terms of the Agreement, with such Interests to attach to the proceeds of the Sale, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Agreement and the proposed Sale Order.

34. The Debtors have conducted a UCC search of other purported lienholders of its assets in conjunction with the proposed Sale of the Assets. The Debtors have served such purported lienholders notice of this Sale Motion, and will serve notice of any Sale Order approving the relief requested by this Sale Motion.

35. Accordingly, this Court should approve the sale of the Assets to the Successful Bidder(s) free and clear of Interests under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

36. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(n) of the Bankruptcy Code, among other things, provides, in turn, that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders as the sale. *See* 11 U.S.C. § 363(n). While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F. 2d 143 (3rd Cir. 1986) has held that:

> [t]he requirement that a Buyer act in good faith . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F. 2d at 147 (citations omitted).

37.     The Agreement was a negotiated, arm's-length transaction, in which the Stalking Horse Purchaser has acted in good faith, without collusion or fraud of any kind, and in compliance with the *Abbotts Dairies* standards. The Stalking Horse Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code. Neither the Debtors nor the Stalking Horse Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of to the Agreement or implicate section 363(n) of the Bankruptcy Code with respect to the consummation of the sale transaction or the transfer of the Assets and the Assumed Executory Contracts to the Stalking Horse Purchaser. In addition, if a party other than Purchaser is the Successful Bidder, the Debtors intend to make an appropriate showing at the Sale Hearing that the purchase agreement with the other Successful Bidder is a negotiated, arm's-length

transaction, in which the Successful Bidder at all times has acted in good faith under and otherwise in accordance with such standards.

38.     The Debtors thus request that the Court find that the Stalking Horse Purchaser or the Successful Bidder has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

**B.     Authorization of Assumption and Assignment of Assumed Executory Contracts**

39.     In order to enhance the value to the Debtors' estate, the Debtors request approval of the assumption and assignment of the executory contracts and unexpired leases identified in the attached Exhibit C (the "Assumed Executory Contracts")[2] to the Successful Bidder(s) upon the Closing of the transactions contemplated under the Asset Purchase Agreement and payment of the cure costs set forth on Exhibit C (the "Cure Costs"), which amounts, if any, are what the Debtors believe are owed to each counterparty (each a "Counterparty," and collectively, the "Counterparties") to an Assumed Executory Contract in order to cure any defaults that exist under such contract or lease.

40.     If a contract or lease is assumed and assigned pursuant to the Court's order approving same, then unless the affected counterparty properly files and serves an objection to the Cure Costs set forth on Exhibit C, the Counterparty will receive at the time of the Closing (or as soon as reasonably practicable thereafter), the Cure Costs as set forth on Exhibit C, with

---

[2] The inclusion of any agreement as an Assumed Executory Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included as an Assumed Executory Contract up until the time of the Sale Hearing.

payment made pursuant to the terms of the applicable Asset Purchase Agreement, or the agreement of the applicable Successful Bidder.

41.     The Successful Bidder(s), on behalf of the Debtors, shall promptly pay or cause to be paid the Cure Costs with respect to the Assumed Executory Contracts. Certain Cure Costs are to be paid by the Debtors as set forth in the Agreement. The Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contracts, which the Stalking Horse Purchaser shall satisfy through its promise to perform following the Closing obligations under the Assumed Executory Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing or in the case of any Assumed Executory Contracts not assumed and assigned to the Successful Bidder(s) at the Sale Hearing, at such other hearing to approve assumption and assignment of such Assumed Executory Contract to the Successful Bidder(s). The Debtors request that Cure Costs disputed by any Counterparty be resolved by the Court at a hearing to be scheduled by the Debtors following the deadline for the counterparties to file objections to the Cure Costs or, if the Debtors do not request such a hearing date, at the Sale Hearing or at such other hearing to approve assumption and assignment of the relevant contract or lease.

42.     Except to the extent otherwise provided in the agreement(s) entered into with the Successful Bidder(s), subject to the payment of any Cure Costs, the assignee of an

Assumed Executory Contracts will not be subject to any liability to the assigned contract or lease

counterparty that accrued or arose before the closing date of the sale of the Assets and the

Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k)

of the Bankruptcy Code.

43.     The Debtors further request that the Sale Order provide that the Assumed

Executory Contracts will be assigned to, and remain in full force and effect for the benefit of the

applicable Successful Bidder, notwithstanding any provisions in the Assumed Executory

Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy

Code, that prohibit such assignment.

44.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or

executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

45.     Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *In re Talco, Inc.*, 558 F. 2d 1369, 1173 (10th Cir. 1977). A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The assumption and assignment of the Assumed Executory Contracts, or any of them, will be a necessary part of the proposed Sale and, as stated above, will benefit the estates of the Debtors.

46.     As set forth above with respect to Assumed Executory Contracts to be assumed and assigned pursuant to the Sale, the Debtors have sent a copy of the Sale Motion to all Counterparties to the Assumed Executory Contracts, notifying such Counterparties of the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Assumed Executory Contracts at the Sale Hearing. Exhibit C hereto sets forth the "cure" amounts owing on each of the Assumed Executory Contracts, according to Debtors' books and records.

47.     The Counterparties will have sufficient opportunity to file an objection to the proposed cure amounts set forth on Exhibit C. To the extent no objection is filed with regard to a particular cure amount, such cure amount shall be binding on the applicable contract or lease counterparty. The payment of the Cure Costs specified on Exhibit C (or a different amount either agreed to by the Debtors or resolved by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular contract is not truly executory, and does not need to be cured to transfer the Assets to the Successful Bidder or, alternatively, the Successful Bidder subsequently elects not to have any Assumed Executory Contracts assumed or assigned to it prior to the Sale Hearing.

48.     Cure Costs disputed by any Counterparties, with respect to any Assumed Executory Contracts to be assumed and assigned to the Successful Bidder at Closing, will be resolved by the Court at the Sale Hearing or other hearing as set forth above.

49.     The Stalking Horse Purchaser or other Successful Bidder is responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Assumed Executory Contracts. The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538

(Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). If necessary, the Stalking Horse Purchaser or Successful Bidder shall provide evidence of its ability to provide adequate assurances to Counterparties at the Sale Hearing.

## C.      **Authorization of Rejection of the Rejected Contracts**

50.      In order to comply with the conditions of the Stalking Horse Purchaser's bid and to realize the highest value for the Assets, the Debtors seek to reject the executory contracts and unexpired leases listed on Exhibit D attached hereto (the "Rejected Contracts") pursuant to section 365(a) of the Bankruptcy Code. The list of Rejected Contracts is attached to the Agreement, but the Stalking Horse Purchaser may add contracts from the list of Rejected Contracts until 15 days prior to the Sale Hearing, and may remove contracts from the list of Rejected Contracts until the Sale Hearing.

51.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F. 2d 1065, 1075 (3rd Cir. 1992). "This provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Co.*, 83 F. 3d 735, 741 (5th Cir. 1996), *citing In re Muerexco Petroleum, Inc.*, 15 F. 3d 60, 62 (5th Cir. 1994).

52. The decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor. *See NLRB v. Bildisco (In re Bildisco)*, 682 F. 2d 72, 79 (3rd Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."); *In re Taylor*, 913 F. 2d 102, 107 (3rd Cir. 1990); *see also In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003); *In re HQ Global Holdings*, 290 B.R. 507, 511 (Bankr. D. Del. 2003). The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001); s*ee also Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

53. Rejection of an executory contract is appropriate where rejection of the contract would benefit the estate. *See Sharon Steel Corp. v. National Fuel Gas Distribution Corp. (In re Sharon Steel Corp.)*, 872 F. 2d 36, 40 (3rd Cir. 1989). The standard for rejection is satisfied when a debtor has made a business determination that rejection will benefit the estate. *See Commercial Fin. Ltd. v. Hawaii Dimensions, Inc. (In re Hawaii Dimensions, Inc.)*, 47 B.R. 425, 427 (D. Haw. 1985) ("under the business judgment test, a court should approve a debtor's proposed rejection if such rejection will benefit the estate.").

54. If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See,*

*e.g., NLRB v. Bildisco & Bildisco*, 462 U.S. at 523 (1984); *In re Federal Mogul Global, Inc.*, 293 B.R. at 126.

55.     In applying the business judgment standard, courts show great deference to the debtor's decisions to reject. *See, e.g., NRLB V. Bildisco & Bildisco*, 462 U.S. at 523 (1984); *In re Federal Mogul Global, Inc.*, 293 B.R. at 126 (court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

56.     Pursuant to section 365(a) of the Bankruptcy Code, the Debtors seek to reject the Rejected Contracts, subject to and upon the Closing, in order to comply with the conditions of the Agreement, as set forth above. Thus, the Debtors believe that it is an exercise of their sound business judgment to seek the rejection of the Rejected Contracts.

57.     The Debtors may have claims against the counterparties under the Rejected Contracts arising under, or independently of, the Rejected Contracts. The Debtors do not waive such claims by the filing of this Motion or the rejection of the Rejected Contracts.

**D.     Authorization to Change Debtor Names**

58.     As set forth above, section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

59.     The Agreement contemplates, *inter alia*, the transfer of certain trademarks associated with the Business to the Stalking Horse Purchaser in connection with the Sale and that the Debtors will cease to use any trademarks or names that are likely to cause confusion post-closing. Accordingly, the Debtors hereby seek permission to change names post-closing, as necessary, in order to comply with the foregoing conditions.

60.     Specifically, the following Debtors seek authorization to change their names, subject to, and conditioned upon the Closing: Monaco Coach Corporation; R-Vision Holdings L.L.C.; R-Vision, Inc.; R-Vision Motorized, LLC; Bison Manufacturing, LLC; and Roadmaster LLC.

### Notice

61.     Notice of this Sale Motion has been provided to (a) the Office of the United States Trustee; (b) counsel to the Secured Lenders; (c) counsel to the Committee; (d) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; (e) all parties who assert liens with respect to the Assets; (f) all entities who executed non-disclosure agreements with the Debtors or Imperial Capital in connection with a potential acquisition of any or all of the Assets or who otherwise have expressed to the Debtors an interest in purchasing the Assets; (g) all counterparties to Assumed Executory Contracts; (h) all of the Debtors' other known creditors, including without limitation all counterparties to Rejected Contracts, and equity interest holders; (i) the United States Attorney's office; (j) all state attorneys general in states in which the Assets are located; (k) the Internal Revenue Service; and (l) for each state in which the Assets are located, the applicable taxing authorities. The

Debtors respectfully submit that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

62.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service. As discussed below, the content and manner of service of this Sale Motion as contemplated in the Bid Procedures Motion and the related notices satisfies all such requirements:

> Section 363 Notice: Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing." Under section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, creditors have been or will be provided notice of the salient details regarding this Sale Motion and the Sale Hearing. Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

> Federal Rule of Bankruptcy Procedure 2002: Bankruptcy Rule 2002 requires twenty days' notice of proposed sales of Property other than in the ordinary course of business. In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002. Local Rule 2002-1(b) specifies the parties on whom a motion for a sale other than in the ordinary course of business must be served in cases pending in this jurisdiction. As set forth in the proposed Bid Procedures Order, the Debtors shall provide sufficient notice of the Auction and of the Sale Hearing to the appropriate parties.

> Federal Rules of Bankruptcy Procedure 6004 and 6006: Bankruptcy Rule 6004 requires that notices of sales of Property out of the ordinary course of business comply with Rule 2002. As set forth above, the Debtors have complied with Bankruptcy Rule 2002. Bankruptcy Rule 6006 requires notice of a motion to assume or assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as this Court may direct. The Cure Notices and notice of the Sale Motion have been or will be served on counterparties to the Assumed Executory Contracts as provided in the Bid Procedures Order entered by the Court, and thus satisfies this requirement.

Procedural Due Process: The notice of this Sale Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Sale Motion and the Sale Hearing.

63.     The Debtors submit that the notice that they have provided and intend to provide of this Sale Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

64.     The Debtors request, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

## Conclusion

65.     The Debtors' proposed sale of the Assets as described in this Sale Motion, including the assumption and assignment of the Assumed Executory Contracts, the rejection of the Rejected Agreements, and the name changes proposed herein, is in each case supported by sound business reasons, as set forth herein. The proposed sale is proper, necessary and serves the best interests of the Debtors, their estates and creditors and all parties in interest. The Debtors thus request that the Court approve the proposed Sale of the Assets free and clear of all interests, liens, claims, and encumbrances including successor liabilities, as requested, including, without limitation, the assumption and assignment of the Assumed Executory Contracts, to the Stalking Horse Purchaser or other Successful Bidder, approve the rejection of the Rejected Agreements, and authorize the proposed name changes by certain Debtors.

**No Prior Request**

66.     No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Sale Motion and authorize the sale of the Assets to the Stalking Horse Purchaser or other Successful Bidder and approve the proposed Agreement in substantially the form attached to this Sale Motion, pursuant to the attached proposed order; (ii) approve the assumption and assignment of the Assumed Executory Contracts in accordance with the Agreement; (iii) approve the rejection of the Rejected Agreements; (iv) authorize the Debtors to change their names post-closing; (v) approve the form and manner of notice of this Sale Motion, and of the proposed sale and assumptions and assignments; and (vi) grant such other and further relief as is just and proper.

Dated: April 24, 2009                    PACHULSKI STANG ZIEHL & JONES LLP

                                         *James E. O'Neill*

                                         Laura Davis Jones (DE Bar No. 2436)
                                         Robert B. Orgel (CA Bar No. 101875)
                                         Malhar S. Pagay (CA Bar No. 189289)
                                         James E. O'Neill (DE Bar No. 4042)
                                         Victoria A. Newmark (CA Bar No. 183581)
                                         Timothy P. Cairns (Bar No. 4228)

                                         919 North Market Street, 17th Floor
                                         P.O. Box 8705
                                         Wilmington, Delaware  19899-8705 (Courier 19801)
                                         Telephone:  302-652-4100
                                         Facsimile:  302-652-4400
                                         email:       ljones@pszjlaw.com
                                                      rorgel@pszjlaw.com
                                                      mpagay@pszjlaw.com
                                                      vnewmark@pszjlaw.com
                                                      tcairns@pszjlaw.com

                                         Counsel for Debtors and Debtors in Possession