IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MCC (f/k/a MONACO COACH | ) | Case No. 09-10750 (KJC) |
| CORPORATION), et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Objections Due: 7/16/09 at 4:00 p.m. (ET) |
| | ) | Hearing Date: 7/23/09 at 2:00 p.m. (ET) |
| | ) | Ref. Nos. 241, 350 |

**MOTION OF ABLECO FINANCE LLC FOR ENTRY OF AN ORDER
ENFORCING THE FINAL CASH COLLATERAL ORDER AND
NAVISTAR SALE ORDER PURSUANT TO 11 U.S.C. § 105**

Ableco Finance LLC, as administrative agent and collateral agent ("Ableco") for the lenders (the "Term Loan Lenders") party to that certain Financing Agreement, dated as of November 6, 2008 (the "Term Loan Agreement"), by and among Monaco Coach Corporation and its subsidiaries, as borrowers, certain other of its subsidiaries, as guarantors (together, the "Debtors"), the Term Loan Lenders, as lenders, and Ableco, hereby submits this motion (the "Motion"), pursuant to 11 U.S.C. § 105(a), seeking the entry of an order, *inter alia*, directing the Debtors (or, in the alternative, any trustee that may be appointed) to turn over sale proceeds pursuant to the Court's (i) Final Order Re Second Motion to Use Cash Collateral (A) Authorizing Use of Cash Collateral; and (B) Granting Adequate Protection Pursuant to Bankruptcy Rule 4001(c), dated May 1, 2009 (D.I. 241) (the "Cash Collateral Order"), and (ii) Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of Assets Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Authorizing the Rejection of Certain Contracts, (V) Authorizing Certain Debtors to Change Their Names Post-Closing and (VI) Granting Related Relief, dated May 22, 2009 (D.I.

{406.005-W0000721.}

350) (the "<u>Navistar Sale Order</u>"). In support of this Motion, Ableco respectfully represents as follows:

### Relief Requested

1. By this Motion, Ableco seeks to enforce its rights, under the Cash Collateral Order and the Navistar Sale Order, to receive full and final payment of all obligations due and owing under the Term Loan Agreement from the proceeds of the sale of its collateral. Although they have articulated no basis for doing so, the Debtors withheld approximately $2 million in proceeds from the Navistar sale that should have been paid to Ableco on account of a prepayment premium (approximately $1.6 million) (the "<u>Applicable Prepayment Premium</u>") and certain other fees and expenses (approximately $300,000; the "<u>Withheld Fees and Expenses</u>," and together with the Applicable Prepayment Premium, the "<u>Withheld Amounts</u>") due and payable under the terms of the Term Loan Agreement, and deposited these proceeds into their counsel's trust account. Ableco has attempted to resolve this issue without the need for this Court's intervention, but has received little or no cooperation from the Debtors and the Committee.[1] Given that no party in interest in these chapter 11 cases has any substantive basis or standing to challenge the validity, enforceability or allowability of the Applicable Prepayment Premium or the Withheld Amounts, Ableco respectfully requests that this Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, directing the Debtors to immediately turn over the proceeds of the sale in the amount of the Applicable Prepayment Premium, accrued and unpaid fees and expenses, and accrued and unpaid interest on the foregoing amounts.

---

[1] With respect to the Withheld Fees and Expenses, Ableco has provided all requested backup information to the Debtors and are hopeful that this portion of the withheld proceeds will be released to Ableco without the involvement of the Court. However, should such proceeds continue to be withheld, Ableco includes the turnover of the Withheld Fees and Expenses as part of the relief requested herein.

{406.005-W0000721.}                                     2

## Background

2. On March 5, 2009 (the "Petition Date"), the Debtors filed a voluntary petition for relief under chapter 11 of title 11, United States Code, 11 U.S.C §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3. To date, no request has been made for the appointment of a trustee or an examiner. On March 20, 2009, an official committee of unsecured creditors (the "Committee") was appointed by the Office of the United States Trustee.

## Facts

**A.  The Cash Collateral Order**

4. As part of the Cash Collateral Order, the Debtors stipulated and agreed to the validity, enforceability and allowability of Ableco's claims and liens and the Term Loan Agreement and the other Term Loan Financing Documents (as such term is defined in the Cash Collateral Order). Specifically, the Debtors stipulated to the following:

(i)  Claims. The Debtors acknowledged their liability to Ableco under the Term Loan Financing Documents for all Term Loan Indebtedness. The Cash Collateral Order defines "Term Loan Indebtedness" as:

>> any and all amounts owing or outstanding under the Term Loan Financing Documents (including, without limitation, all "Obligations" as defined in the Term Loan Agreement), and all interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any ... other fees and expenses that are chargeable or reimbursable under the application provisions of the Term Loan Financing Documents), and any and all obligations and liabilities, contingent or otherwise outstanding thereunder.

Cash Collateral Order, ¶ D.2. As demonstrated below, the Applicable Prepayment Premium and the Withheld Fees and Expenses are "Obligations" under the Term Loan Agreement, and are therefore "Term Loan Indebtedness" under the Cash Collateral Order.

>> (ii) <u>Liens</u>. The Debtors also acknowledged to the validity and enforceability of the Term Loan Liens (as such term is defined in the Cash Collateral Order) securing the Term Loan Indebtedness and any guarantees thereof in and to the pre-petition collateral. <u>Id.</u> at ¶ D.3.

>> (iii) <u>Term Loan Financing Documents</u>. Finally, the Debtors acknowledged, agreed and stipulated that:

>> the Term Loan Financing Documents are valid and binding agreements and obligations on of the Debtors, and the Term Loan Liens (i) constitute valid, binding, enforceable and perfected priority security interests and Liens ... and (II) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, [and] (b) the Term Loan Indebtedness constitutes the legal, valid and binding obligation of the Debtors, enforceable in accordance with its terms, (I) no objection, offset, defense or counterclaim of any kind or nature to the Term Loan exists, and (II) subject to the Intercreditor Agreement [between Bank of America and Ableco], the Term Loan Indebtedness, and any amounts paid at any time to Ableco or any Term Loan Lender on account thereof or with respect thereto, are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

<u>Id.</u> at ¶ D.4.

5.  The Debtors "waived, discharged and released any right they have to challenge any of the Term Loan Indebtedness and the security for those obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of actions against Ableco and Term Loan Lenders ...." Id. at ¶ D.5.

6.  As is typical for orders of this type, the Cash Collateral Order contains provisions providing for the rights of certain parties other than the Debtors to investigate and challenge Ableco's claims and liens and the validity and enforceability of the Term Loan Financing Documents. The investigation and challenge period expired on May 26, 2009. Id. at ¶ 10.

7.  Neither the Committee nor any other party in interest challenged the validity, perfection and enforceability of the pre-petition liens and the amount and allowability of the Term Loan Indebtedness, or asserted any other claims or causes of action against Ableco during the challenge period. Upon the expiration of the challenge period without a challenge, the above-referenced stipulations by the Debtors became binding on the Committee and all other parties in interest in all respects.[2]

8.  Furthermore, Bank of America, as agent for the ABL Lenders[3] ("BofA") is also barred from challenging the Term Loan Liens or the Term Loan Indebtedness pursuant to the terms of the Intercreditor Agreement, dated as of November 6, 2008 (the "Intercreditor Agreement"), between Ableco, as agent for the Term Loan Lenders, and BofA, as agent for the

---

[2] In light of the Debtors' Motion to Convert Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code filed on June 19, 2009 (D.I. 418), it should be noted that the Debtors' stipulations and waivers are also binding on a chapter 7 trustee. Id. at ¶ 10.

[3] The "ABL Lenders" are those certain financial institutions party to that certain prepetition Loan and Security Agreement, dated as of November 6, 2008, among the Debtors, the ABL Lenders and BofA, as agent for the ABL Lenders, pursuant to which the ABL Lenders provided the Debtors with a revolving line of credit with a maximum commitment of $80 million.

ABL Lenders. Intercreditor Agreement, § 2.1(b) ("Each of the ABL Agent, for itself and on behalf of each other ABL Secured Party, ... agrees that it shall not (and hereby waives any right to) contest, or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the priority, validity, perfection or enforceability of a Lien held by or on behalf of any of the Term Secured Parties in the Term Priority Collateral or by or on behalf of any of the ABL Secured Parties in the Term Priority Collateral, as the case may be, or (ii) the validity or enforceability of any ABL Security Document (or any ABL Obligations thereunder) or any Term Security Document (or any Term Obligations thereunder)").

9.   As such, none of the Debtors, the Committee, BofA or any trustee that may be appointed, have standing to object to the allowability of, or challenge in any way, the validity or enforceability of the Term Loan Indebtedness, the Term Loan Liens or the Term Loan Financing Documents.

10.   Finally, as a condition to allowing the use of cash collateral in compliance with the cash collateral budgets, if the Debtors hold cash proceeds of Term Loan Priority Collateral[4] in excess of the budgets applicable to such collateral (excluding amounts for certain disbursements plus the budget variances), the Debtors are required to immediately pay Ableco such amounts until the Term Loan Indebtedness is satisfied. Cash Collateral Order, at ¶ 3.6.1. Ableco fully complied with the Cash Collateral Order and made all budgeted amounts available for use by the Debtors. The cash collateral budget expired on June 4th, and Ableco has no continuing obligation to make any more cash collateral available for use by the Debtors. As such, the Cash Collateral Order mandates that all proceeds of the Term Loan Priority Collateral

---

[4] "Term Loan Priority Collateral" refers to assets of the Debtors pledged to Ableco and the ABL Lenders on which, pursuant to the Intercreditor Agreement between Ableco and BofA, Ableco has a first priority interest and the ABL Lenders have a second priority interest.

must be immediately turned over to Ableco until the Term Loan Indebtedness, including the Applicable Prepayment Premium and the other Withheld Amounts, is paid in full.

**B.     The Navistar Sale and the Navistar Sale Order**

11.    Pursuant to the Navistar Sale Order, the Debtors were authorized to sell (the "Navistar Sale") substantially all of their assets related to the Debtors' motorhome, towable recreational vehicle, and chassis manufacturing business free and clear of all liens, pursuant to the terms of that certain Asset Purchase Agreement, dated as of April 23, 2009, among Workhorse International Holding Company, as purchaser, Navistar, Inc., as guarantor and certain of the Debtors, as sellers.  The sale closed on June 4, 2009.  The net cash proceeds of the Navistar Sale paid to the Debtors was $44,919,136.91, of which $24,243,716.69 was allocated to Term Loan Priority Collateral.

12.    There is no dispute that all of the assets sold pursuant to the Navistar Sale constituted either Term Loan Priority Collateral or ABL Priority Collateral.  There is also no dispute that Ableco has a first-priority, properly perfected, enforceable, unavoidable lien on the Term Loan Priority Collateral.  Upon the sale, Ableco's first-priority lien on the Term Loan Priority Collateral attached to the proceeds attributable to such collateral.  Navistar Sale Order, ¶ Q (Ableco's liens attached to the "consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any" as before closing of the sale).

**C.     The Remaining Term Loan Indebtedness**

13.    The clear and unambiguous language of the Term Loan Agreement provides that the Withheld Amounts are Term Loan Indebtedness.  The Term Loan Agreement defines "Obligations" to include, in relevant part:

> the obligation (irrespective of whether a claim therefore is allowed
> in an Insolvency Proceeding) to pay principal, <u>interest</u> (including,

> without limitation, the PIK Amount), charges, <u>expenses, fees</u>, the <u>Applicable Prepayment Premium</u>, if any, <u>attorneys' fees</u> and disbursements, indemnities and other amounts payable by such Person under the Loan Documents ....

Term Loan Agreement, § 1.01 (emphasis added).

14. The Applicable Prepayment Premium is due and payable as Term Loan Indebtedness in the event that the Debtors prepay all or a portion of the term loan amount prior to maturity:

> for any reason, including in connection with ... (C) <u>the acceleration of the Obligations after the occurrence and during the continuance of an Event of Default</u>, ... [or] (E) <u>the sale of the Collateral in any Insolvency Proceeding</u> ... in view of the impracticability and extreme difficulty of ascertaining the actual amount of damages to [Ableco and the Term Loan Lenders] or profits lost by [Ableco and the Term Loan Lenders] as a result of such prepayment, and by mutual agreement of the parties as to a reasonable estimation and calculation of the lost profits or damages of [Ableco and the Term Loan Lenders], <u>[the Debtors] shall pay [Ableco] in cash, the Applicable Prepayment Premium</u>, if any, measured as of the date of such termination or prepayment.

Term Loan Agreement, § 2.05(b)(iii) (emphasis added).

15. Here, the prepayment of principal out of the proceeds of Term Loan Priority Collateral realized from the Navistar Sale and the sale of the Debtors' resort properties triggers the Applicable Prepayment Premium under both of the above-referenced provisions. The sales were of Ableco's "Collateral" and were consummated under section 363 of the Bankruptcy Code as part of the Debtors' chapter 11 cases. And, the commencement of the chapter 11 cases is an "Event of Default" under the Term Loan Agreement that triggered the automatic acceleration of the Term Loan Indebtedness. Term Loan Agreement, § 9.01.

16. The amount of the Applicable Prepayment Premium is calculated as a percentage of principal repaid, with the percentage determined based on the time remaining to

maturity of the Term Loan Indebtedness. Prepayments in the first year after the effective date (November 7, 2008) trigger a 5% premium; prepayments in the second year trigger a 3% premium; prepayments in the third year trigger a 2% premium. Term Loan Agreement, § 1.01. After the 3rd anniversary of the effective date, the Applicable Prepayment Premium reduces to zero. Id. As the prepayments here were made within the first year after the Effective Date, the Applicable Prepayment Premium is 5% of the principal repaid and amounts to $1,597,469.16.

17.  With respect to accrued fees and expenses, such amounts are payable on demand and, in any event, upon a prepayment that reduces the Term Loan Indebtedness to zero, upon the making of such prepayment. Term Loan Agreement, §§ 2.05(f) and 12.04. The amount of Withheld Fees and Expenses is $296,767.38.[5] Ableco has provided the Debtors with verification for these fees and expenses.

18.  In anticipation of the June 4th closing of the Navistar Sale, on June 3, 2009, Ableco provided the Debtors with a spreadsheet setting forth the amount of principal, interest, fees, expenses and the Applicable Prepayment Premium due and owing as of June 4, 2009. The aggregate payoff amount was $23,223,957.92 (the "Payoff Amount"). Given that the net sale proceeds allocated to Term Loan Priority Collateral were more than sufficient to satisfy all of the Term Loan Indebtedness, including the Applicable Prepayment Premium (i.e., $1,019,758.77 greater than the Payoff Amount), Ableco expected to be repaid in cash, in full upon the closing of the Navistar Sale.

19.  However, the Committee and the Debtors, without articulating any basis, objected to the portion of the Payoff Amount constituting the Applicable Prepayment Premium and the Withheld Fees and Expenses. As a result, the Debtors withheld a portion of the Navistar

---

[5] In addition to the Withheld Fees and Expenses, Ableco is incurring additional fees and expenses, including legal fees, to prosecute this Motion. These fees and expenses are Term Loan Indebtedness and also must be paid to satisfy the Term Loan Indebtedness in full.

Sale proceeds attributable to the Term Loan Priority Collateral in an amount equal to the Withheld Amounts, and deposited such funds into the Debtors' counsel's trust account. Approximately $1 million in excess proceeds were also deposited into the trust account. The Withheld Amounts are accruing interest at a rate of approximately $1,000 per day.

20. Ableco has demonstrated the validity of its claim for the Applicable Prepayment Premium in several emails to counsel for the Debtors, the Committee and BofA. Furthermore, Ableco has provided all requested back-up information for the unpaid fees and expenses. None of these parties have provided any substantive response. The Debtors' refusal to remit the Withheld Amounts, including the Applicable Prepayment Premium, to Ableco is in violation of the Cash Collateral Order and the Navistar Sale Order. Ableco submits that the Debtors have no good faith basis to continue to withhold such funds, and as such, Ableco is entitled to immediate turnover of the Withheld Amounts.

**Argument**

21. As set forth above, the terms of the Cash Collateral Order and the Navistar Sale Order clearly dictate that the Debtors must turn over the proceeds of Term Loan Priority Collateral equal to the amount of the Withheld Amounts. Given that the Debtors refuse to remit these proceeds to Ableco voluntarily, this Court is authorized under section 105 of the Bankruptcy Code to enter an order directing compliance with the orders and the turnover of the proceeds.

22. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title [and that] [n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making

any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). Pursuant to section 105(a), the Court has the power to enforce its previous orders and direct the Debtors to turn over the sale proceeds to which Ableco is entitled. See In re Marcus Hook Development Park, Inc., 943 F.2d 261, 266 (3d Cir. 1991) (noting that section 105(a) "gives the bankruptcy court the power and the jurisdiction to enforce its valid orders") (internal quotations and citations omitted); In re Protarga, Inc., 329 B.R. 451, 479 (Bankr. D. Del. 2005) ("It is axiomatic that a court possesses the inherent authority to enforce its own orders.") (internal quotations and citations omitted).

23.   Furthermore, the Cash Collateral Order and the Navistar Sale Order themselves reserve jurisdiction of this Court to enforce them. See Cash Collateral Order, ¶ 12.5 ("This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Final [Cash Collateral] Order and relating to the ... use of Cash Collateral ...."); Navistar Sale Order, ¶ 49 ("This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this [Navistar Sale] Order ... in all respects and to decide any disputes concerning this [Navistar Sale] Order and the [Asset Purchase] Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the [Asset Purchase] Agreement and this [Navistar Sale] Order, including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, ... and all issues and disputes arising in connection with the relief authorized herein ....")

24.   The facts and circumstances presented here unquestionably support the entry of an order directing the turnover of the Withheld Amounts. First, in the Cash Collateral Order, the Debtors stipulated and acknowledged that the Term Loan Indebtedness (which includes any and all amounts owing or outstanding under the Term Loan Agreement) constitutes

legal, valid and binding obligations of the Debtors secured by the Term Loan Liens, enforceable in accordance with its terms, and waived any right to challenge the validity or enforceability of the Term Loan Indebtedness.

25. Second, no other party in interest has standing to challenge the Withheld Amounts to Ableco.[6] The Committee's challenge and investigation period with respect to the Term Loan Lenders' liens and claims expired on May 26th without any challenge being filed. By not filing a challenge, the Debtors' "agreements, acknowledgements, releases and stipulations contained in paragraphs C, D and 11 of this [Cash Collateral Order] shall be irrevocably binding on all parties, the estates, Committee and all parties in interest (including without limitation a receiver, administrator, or trustee appointed in any of the Cases or any successor case or in any jurisdiction) without further action by any party or this Court and the Committee and any other party in interest (including without limitation a receiver, administrator, or trustee appointed in any of the Cases or any successor case or in any jurisdiction) shall therefore be forever barred from bringing any Challenge with respect to the Secured Lenders." Cash Collateral Order, ¶ 10. In addition, BofA is also barred from disputing Ableco's claim pursuant to § 2.1(b)(ii) of the Intercreditor Agreement, whereby B of A expressly agreed that it "shall not (hereby waives any right to) contest, or support any other Person in contesting, in any proceeding (including any Insolvency of Liquidation Proceeding), ...the validity or enforceability of any ... Term Security Document (or any Term Obligations thereunder)."

---

[6] Notwithstanding the fact that no party has standing to challenge the allowability of the Applicable Prepayment Premium, to the extent that any party attempts to do so on the ground that the premium is unreasonable, Ableco submits that such argument is without merit. The Applicable Prepayment Premium is reasonable and appropriate under New York law (the governing state law under the Term Loan Financing Documents) and § 506(b) of the Bankruptcy Code. See In re United Merchants and Manufacturers, Inc., 674 F.2d 134 (2d Cir.1982) (enforcing prepayment fee under New York law liquidated damages analysis); In re Financial Center Assocs., 140 B.R. 829 (Bankr. E.D N.Y. 1992) (approving a prepayment fee under New York law and § 506(b) that amounted to approximately 25% of the $26.75 million loan at issue).

26. Third, the Debtors are currently in possession of proceeds of Term Loan Priority Collateral in excess of what is due and owing under the Term Loan Agreement, and therefore, pursuant to the Cash Collateral Order, are explicitly required to immediately remit proceeds of Term Loan Priority Collateral to Ableco until the Term Loan Indebtedness is repaid in full. Cash Collateral Order ¶ 3.6.1.

27. Fourth, pursuant to the Term Loan Agreement, the Applicable Prepayment Premium is due and owing on account of the Debtors' prepayment of the outstanding principal with the proceeds of the resort properties sales and the Navistar Sale. Each of these sales involved the sale of Term Loan Priority Collateral and was consummated under section 363 of the Bankruptcy Code in connection with the Debtors' chapter 11 cases, which triggered the Debtors' obligation to pay the Applicable Prepayment Premium under § 2.05(b)(iii)(E) of the Term Loan Agreement. Alternatively, the prepayment was in connection with "the acceleration of the Obligations after the occurrence and during the continuance of an Event of Default" (i.e., the bankruptcy filing), which triggered the Debtors' obligation to pay the Applicable Prepayment Premium under § 2.05(b)(iii)(C) of the Term Loan Agreement. Furthermore, although there is no dispute that Ableco is entitled to be reimbursed for its fees and expenses under the Term Loan Agreement, and Ableco has provided all documentation requested to substantiate the Withheld Fees and Expenses, the Debtors have continued to withhold these funds for no apparent reason.

## Conclusion

28. No party in interest has standing to challenge the Withheld Amounts, including the Applicable Prepayment Premium, due and owing to Ableco under the Term Loan Agreement. Even if a party did have standing, there is no basis for such a challenge, as the Applicable Prepayment Premium is a reasonable liquidated damages provision that is routinely

enforced by courts. As such, the Debtors failure to pay Ableco the Applicable Prepayment Premium is in violation of the Cash Collateral Order and the Navistar Sale Order. Accordingly, the Court should direct the Debtors to turn over the Withheld Amounts to Ableco immediately.

### Notice

29. Notice of this Motion has been provided to: (a) the Debtors; (b) counsel to the Debtors; (c) the Office of the United States Trustee for the District of Delaware; (d) counsel to the Committee; and (e) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, Ableco submits that no other or further notice is required.

WHEREFORE, Ableco respectfully requests that this Court enter an order (i) directing the Debtors to turn over sale proceeds constituting the Withheld Amounts; and (ii) granting such other relief as is just and proper.

Dated: June 22, 2009
Wilmington, Delaware

LANDIS RATH & COBB LLP

_/s/ Adam G. Landis_____
Adam G. Landis (No. 3407)
William E. Chipman, Jr. (No. 3818)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

--and--

Adam C. Harris
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

Attorneys for Ableco Finance LLC, as Administrative Agent

{406.005-W0000721.}                                14